**Theodore BRENNER, d/b/a Teddy Brenner Enterprises, Plaintiff-Appellant,**

v.

**WORLD BOXING COUNCIL and Jose Sulaiman Chagnon, Defendants-Appellees.**

Nos. 384, 431, Dockets 81–7478, 81–7556.

United States Court of Appeals, Second Circuit.

Argued Nov. 25, 1981.

Decided March 18, 1982.

Pamela G. Ostrager, New York City (Carleton G. Eldridge, Jr., Coudert Brothers, New York City, of counsel), for plaintiff-appellant.

Ellen S. Huvelle, Washington, D. C. (Richard M. Cooper, Williams & Connolly, Washington, D. C., Melvin Simensky, New York City, of counsel), for defendants-appellees.

Before KAUFMAN, TIMBERS and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Theodore "Teddy" Brenner, a promoter of boxing matches, appeals from a judg-

ment entered after a jury trial by the United States District Court for the Southern District of New York, Charles M. Metzner, *Judge*, dismissing his complaint, which charged the World Boxing Council ("WBC") and its president, Jose Sulaiman Chagnon ("Sulaiman"), with engaging in an unlawful conspiracy and a group boycott in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (1976). Brenner also appeals from Judge Metzner's denial of a motion for judgment notwithstanding the verdict or in the alternative for a new trial on the group boycott claim, and from an order preserving costs taxed against him and relieving appellees from costs previously taxed.

In addition, Brenner challenges the grant of appellees' motion for a directed verdict on his Section 1 conspiracy claim, the jury instructions on his group boycott claim, the trial court's handling of a witness' testimony, and the awarding of costs to appellees. For the reasons set forth below, we affirm the judgment and orders of the district court.

## BACKGROUND

As this case demonstrates, when you are attempting to promote a professional championship boxing match, you had better keep your guard up. The main participants in this legal contest are Teddy Brenner, a promoter of boxing matches for over forty years, the WBC, one of the two dominant international boxing regulatory bodies,[1] its president Jose Sulaiman Chagnon, and Don King, a competitor of Brenner. Because this is an appeal from, *inter alia*, the dis-

missal of Brenner's Section 1 conspiracy claim, we will, as we must, consider the evidence, as complicated as it is, in the light most favorable to the appellant. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696 n.6, 82 S.Ct. 1404, 1409 n.6, 8 L.Ed.2d 777 (1962).

The chronology of events giving rise to this lawsuit began on January 28, 1978 when Alexis Arguello captured the WBC super featherweight championship from Alfredo Escalera. The next day, Arguello's manager, Dr. Eduardo Roman, signed a contract with fight promoter Don King for a rematch.

Months later, on July 26, Arguello and Roman entered into a contract with New York's Madison Square Garden granting the Garden the right of first refusal for all of Arguello's bouts for one year. At the time, Brenner was president of boxing at the Garden. The agreement stipulated that it would remain in effect only as long as Brenner retained that position. Brenner left the Garden and became an independent boxing promoter on September 1. One month later, Brenner signed a contract with Arguello and Roman which gave Brenner the right to promote Arguello's bouts for the next three years.

On October 20, with the Arguello contract apparently secured, Brenner contracted with CBS Sports for the telecast of an Arguello-Escalera rematch. Escalera signed a contract for the fight on October 25, but under the terms of the contract, Escalera and his business manager, Paul

---

1. The World Boxing Council is a non-profit sports regulatory body formed in 1963 to promote the organized, uniform and honest presentation of professional boxing matches around the world. The principal functions of the WBC are to recognize WBC world championship boxers in various weight classes, to prescribe a system of ranking fighters, to designate minimum defense requirements of champions, and to establish rules governing the conduct of WBC bouts. The governing body of the WBC is the executive committee, which is composed of two members from each of the seven continental federations, the three vice-presidents, the secretary general and the president of the WBC. The members of the executive committee receive no compensation and have no commercial interests in boxing. Non-voting or associate memberships to the WBC are open to any party wishing to affiliate itself with the WBC. These members, which include state boxing commissions, boxers, managers and promoters, receive WBC publications, and are entitled to attend WBC conventions. Tr. 794–817; Pl. Ex. 153, World Boxing Council Constitution, By Laws, Rules and Regulations.

The other dominant boxing regulatory body is the World Boxing Association (WBA). Like the WBC, the WBA promotes championship boxing matches around the world. Tr. 818–819.

Ruiz, retained the right to void the contract by notifying Brenner prior to November 4. On October 26, Ruiz negotiated an agreement with Don King for the promotion of the same fight, but that agreement was neither signed by Escalera nor dated. Ruiz contacted Brenner that same day and informed him of the offer from King. When Brenner agreed to up the ante, Ruiz signed an irrevocable contract with Brenner for the fight. Meanwhile, Don King predated his October 26 contract with Ruiz to September 5 and submitted it to Jose Sulaiman on October 27.

Sometime later Roman, despite Arguello's exclusive contract with Brenner, signed a contract with Don King for an Arguello-Arturo Leon bout. On the eve of that bout, Roman entered into another contract with King for Arguello's next fight, against Bobby Chacon. Then on November 7, 1978, Roman contracted with Brenner for an Arguello-Escalera fight to take place on February 3, 1979, provided there was no conflict with the Chacon bout.

The WBC held its annual convention from December 4 through December 7, 1978. Don King attended and submitted his contracts for the Arguello-Escalera and Arguello-Chacon bouts to the convention.[2] The convention refused to certify these bouts, instead directing Arguello to defend his title against the WBC's number one rated contender, Rafael "Bazooka" Limon as required by WBC rules.[3]

Shortly afterward, Brenner informed Sulaiman that he had signed contracts with Arguello and Escalera and with CBS for a rematch, and that he needed WBC sanction for the fight in order to launch his career as an independent promoter and to establish his credibility with the television networks. Sulaiman responded that although the convention had already voted to have Arguello fight Limon, he would nevertheless try to help Brenner by taking the matter back to the convention.

The following day, the convention reconsidered the matter of Arguello's next title defense, and voted to certify Brenner's Arguello-Escalera match provided three conditions were met: (1) Limon agreed to step aside; (2) Brenner's match would not be postponed; and (3) any dispute between Brenner and King over the Arguello-Escalera bout would be resolved either by agreement or in court.

Meanwhile, by letter dated December 6, 1978, Don King informed CBS that he claimed rights to the Arguello-Escalera fight. On December 8, 1978, King telegraphed Sulaiman that he had not relinquished his rights to the Arguello-Escalera fight and that he had a contract for a prior bout between Arguello and Chacon.

The following day, Roman informed King that while he had signed with King for the Arguello-Chacon bout, he had signed with Brenner for the Arguello-Escalera match. On December 11, Escalera's manager telegraphed Brenner to confirm that Brenner was the promoter of the fight.

In a December 13 telegram and a December 17 letter, Brenner reiterated to Sulaiman that he, not King, had the rights to the Arguello-Escalera fight and enclosed in the letter a copy of his exclusive contract with Arguello.

Sulaiman responded that the WBC had competing contracts submitted by King,

---

**2.** Under the WBC rules all contracts for world title fights must be submitted to the WBC within 30 days of signing. Further, all title fight contracts must be registered at the WBC offices. Article XII §§ 9–10, World Boxing Council Constitution, By Laws, Rules and Regulations.

**3.** Under the WBC rules then in effect, a champion in a weight division was required to defend his title in a "mandatory defense" at least once a year against the number one rated contender, unless the contender was unwilling or unable to participate in the fight, in which case the champion was required to meet the next highest rated available contender. Art. XII § 1, World Boxing Council Constitution, By Laws, Rules and Regulations. The purpose of this rule was to prevent the champion from avoiding the worthiest opponents. Tr. 832–36. A champion may be stripped of his title for violating this rule. Art. XII § 2, World Boxing Council Constitution, By Laws and Regulations.

and that the convention had decided that Brenner would receive WBC approval for the fight only if his dispute with King was resolved. About this time, Ruiz telephoned Sulaiman to discuss the promotion of the Arguello-Escalera fight. Sulaiman stated that he had a contract signed by Arguello for the Escalera bout to be promoted by Don King. Ruiz told Sulaiman that he had spoken to Roman, who had denied that Arguello ever signed with King. Sulaiman responded that he was going to remain neutral, and that it was up to King and Brenner to resolve the dispute.

Thereafter, Brenner and King, using Sulaiman as a mediator, attempted to reach a settlement. King offered to relinquish his rights to the fight for $50,000. Brenner then retained boxing promoter Bob Arum to negotiate on his behalf. Arum counteroffered $15,000. King in turn submitted $25,000 as a settlement price. At that point, Brenner elected to handle the negotiations by himself, dismissing Arum.

Meanwhile, by a letter dated December 20, CBS cancelled its contract with Brenner stating that its legal department had determined that Brenner did "not own all of the necessary ancillary rights to grant to CBS Sports exclusive television broadcast rights to [the fight]." Thereafter, in an attempt to solidify his position, Brenner brought an action[4] seeking to enjoin King from interfering with Brenner's Arguello-Escalera match. On January 12, 1979, Brenner's motion for an injunction was denied.

Despite this setback, on January 12, 1979, Brenner entered into a television contract with ABC Sports for the fight. In addition, on January 17, Brenner sent Sulaiman a letter purporting to confirm that the WBC had sanctioned Brenner's Arguello-Escalera bout and that the fight took precedence over King's Arguello-Chacon fight.

On January 23, Brenner delivered to King a $25,000 check postdated to Monday, February 5, 1979, the day after the scheduled Arguello-Escalera fight as consideration for the settlement, a copy of each going to Sulaiman.

Upon receipt of Brenner's check, King called Sulaiman, protesting the postdating of the check and asking Sulaiman to stop the fight. Sulaiman refused, citing the adverse publicity that would result if the WBC cancelled a title bout on such short notice. Sulaiman did call Brenner, however, who explained that he had postdated the check to insure that the fight would take place and promised that King would be paid after the fight. By letter to Sulaiman dated January 30, 1979, King stated that in addition to the $25,000 settlement figure, the parties had agreed that King would promote a fight between the winner of the Arguello-Escalera match and Rafael Limon, and a subsequent defense against Bobby Chacon. King delivered a copy of the letter to Brenner, who, two days later, informed King and Sulaiman that because of the differing terms set forth in the letter, he had stopped payment on the check.

The Arguello-Escalera fight occurred on February 4, 1979, and Brenner realized over $14,000. Subsequently, Sulaiman tried unsuccessfully to determine whether Brenner would pay King. Then, in a February 15 letter, Sulaiman charged Brenner with sundry violations of WBC rules and requested that he either fulfill his obligations to the WBC or present his case to one of the two WBC investigatory committees—the Grievance and Appeals Committee or the Disciplinary Committee. In the letter, Sulaiman asserted that Brenner had failed to present a promoter's license to the WBC, to pay his 1979 promoter's fee, or to register the contracts for the Arguello-Escalera bout with the WBC. Further, the letter stated that Brenner had failed to comply with the three preconditions to acquiring WBC approval for the Arguello-Escalera fight outlined at the WBC convention.

That same day, Sulaiman sent a letter to the WBC's executive committee recounting the course of the settlement negotiations

---

4. The record does not indicate whether Brenner's suit for an injunction against King was filed in a state or federal court. We do not need an answer to that question in order to decide this appeal.

between Brenner and King, the agreement reached by the parties, and Brenner's subsequent refusal to pay the $25,000 to King. Sulaiman also stated that he was sending King a check for the amount owed by Brenner[5] and that Brenner should not be allowed to promote WBC title fights until he fulfilled his "commitments."

Using Brenner's associate Don Majeski as an intermediary, Sulaiman scheduled a meeting with Brenner to be held in Mexico. On advice of counsel, however, Brenner decided not to attend. On February 27, 1979, Sulaiman again wrote to the executive committee of the WBC outlining the history of the dispute with Brenner and urging the committee to vote on an attached ballot to suspend Brenner from the WBC until he fulfilled his commitments or explained to the WBC why he had not done so. Thereafter, Sulaiman telephoned all members of the executive committee but one, explained the situation and offered his reasons for recommending suspension. All of the members contacted voted for Brenner's suspension.

Following the polling of the executive committee, Sulaiman made further abortive attempts to meet with Brenner. Finally, Sulaiman informed Brenner by a letter dated May 2, 1979 that he was suspended from promoting WBC world title fights because of his failure to comply with his commitments. Sulaiman also informed Brenner that he could appeal the suspension to the Grievance and Appeals Committee or to the Disciplinary Committee of the WBC. Brenner' neither responded to this letter nor availed himself of either appeals procedure.

Thereafter, Sulaiman made other attempts to meet with Brenner including an attempt at the WBC convention in December 1979. Brenner, however, failed to attend the convention. Finally, Brenner and Sulaiman met later that month. At that meeting Brenner requested that his suspension be lifted immediately to enable him to promote an Arguello-Ruben Castillo match. Brenner offered to produce a check for the $25,000 owed to King if Sulaiman would agree to guarantee the fight. Sulaiman offered to do his best, but stated that the lifting of Brenner's suspension was up to the executive committee and that he therefore could not give a guarantee.

Nothing further occurred until February 14, 1980, when Brenner filed a complaint in the United States District Court for the Southern District of New York charging the WBC and Sulaiman with conspiring to exclude Brenner "from competition in the promotion and exhibition of and the sale of television rights in professional championship boxing contests in the United States" in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (1976). J. App. at 19a. Appellees denied these allegations and filed four counterclaims, each arising out of the WBC certification of the Arguello-Escalera match promoted by Brenner.[6] In December 1980, Sulaiman and the WBC moved for summary judgment dismissing the complaint, and for partial summary judgment on their counterclaims. Brenner too moved for summary judgment, alleging that his suspension constituted a group boycott that was *per se* illegal under Section 1 of the Sherman Act. Brenner also moved for summary judgment dismissing defendants' counterclaims.

By an opinion and order dated February 6, 1981, Judge William C. Conner denied all motions. Thereafter, the case was transferred to Judge Charles M. Metzner. The issues framed for trial were, *inter alia*, whether Sulaiman and the WBC had conspired with boxing promoters, including Don King, to eliminate Brenner as a competitor and had engaged in a group boycott by suspending Brenner from promoting WBC world title fights. Don King invoked his Fifth Amendment privilege in response to all questions presented to him at pretrial depositions and Judge Metzner granted ap-

---

5. Sulaiman did in fact send King a check for $25,000, which King returned to Sulaiman uncashed.

6. Appellees counterclaims alleged: (1) breach of contract; (2) misrepresentation and deceit; (3) misappropriation and invasion of privacy; and (4) unjust enrichment. J.App. at 26a–37a.

pellees' motion to quash the trial subpoenas of King and Don King Productions, Inc., finding King to be unavailable to testify at trial.

At the conclusion of Brenner's case, Judge Metzner entered a directed verdict for the appellees on Brenner's Section 1 conspiracy charge, finding that "there [were] no facts in this record from which a jury may draw a reasonable inference that a conspiracy existed between King and Sulaiman to have the World Boxing Council suspend Brenner and restrain competition in the field of boxing promotion." J.App. at 114a. In addition, Judge Metzner dismissed three of appellees' counterclaims, and limited recovery on the remaining counterclaim to $1,500. Following the denial of crossmotions for a directed verdict, the case was submitted to the jury. Judge Metzner instructed the jury that it must find for Brenner if he proved by a fair preponderance of the evidence: (1) that his suspension was effected by the WBC and Sulaiman for the purpose of preventing Brenner from engaging in his trade; or (2) that appellees' conduct did not fall within the recognized exception to *per se* group boycotts. After two and one-half days of deliberation, the jury found for appellees on the group boycott claim and for Brenner on the counterclaim. Accordingly, the district court entered judgment dismissing the complaint and the counterclaims.

Brenner then moved unsuccessfully for judgment notwithstanding the verdict or, in the alternative, for a new trial on his group boycott claim. Judge Metzner also ruled that costs awarded to Brenner should be stricken.

## DISCUSSION

On appeal, Brenner contends that the record is sufficient to support a reasonable inference of a Section 1 conspiracy, and that his suspension by the WBC constitutes a group boycott. Further, Brenner challenges the trial court's ruling with respect to the testimony of Don King, and claims that the court abused its discretion in awarding costs to appellees while denying costs to him.

### I. The Section 1 Conspiracy Claim

In order to establish an unlawful conspiracy under Section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), a plaintiff must prove that two or more persons acted in concert to restrain trade. *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 141–42, 88 S.Ct. 1981, 1985–1986, 20 L.Ed.2d 982 (1968); *see Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1029 (2d Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979). Concerted action need not be proved directly, but can be based upon circumstantial evidence; for example, from inferences drawn from the words and conduct of the parties to the agreement and from their course of dealing, *Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 704, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658 (1969) (*per curiam*); *American Tobacco Co. v. United States*, 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1138–1139, 90 L.Ed. 1575 (1946). However, at a minimum "the circumstances [must be] such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir.), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976) (quoting *American Tobacco Co. v. United States*, 328 U.S. at 810, 66 S.Ct. at 1139).

In the instant case, Brenner asserts that his evidence established, *inter alia*, that: (1) he had valid contracts to promote an Arguello-Escalera bout; (2) King falsely asserted rights to the fight; (3) Sulaiman and the WBC were aware of the falsity of King's claims; (4) despite this knowledge, the WBC and Sulaiman compelled Brenner to pay King $25,000 in order to obtain WBC certification for the Arguello-Escalera fight; (5) Brenner agreed to pay King, and then King reneged on the agreement by asserting additional terms; (6) when Brenner refused to yield to these new demands made by King, Sulaiman suspended Brenner; and (7) as a result of the suspension,

King reaped all of the financial benefits of Brenner's exclusive service contract with Arguello. Reply Br. for Brenner at 3–5. Brenner contends that these facts support a reasonable inference that appellees engaged in a conspiracy to promote the interests of King and to place Brenner at a competitive disadvantage in the promotion of boxing matches. We conclude, however, that Brenner's evidence did not establish each of these facts, and that those facts which were established do not support a reasonable inference of a conspiracy.

The evidence taken in the light most favorable to Brenner established that Brenner and Don King competed for the promotion of an Arguello-Escalera rematch, and that both promoters acquired signed contracts for the bout. Then, King predated his contract with Escalera before submitting it to the WBC for approval. Even assuming that King's contracts for the fight were invalid, there is no evidence in the record that the WBC or Sulaiman knew prior to the WBC convention that they were invalid. In addition, despite having contracts signed by both fighters, Brenner neither informed the WBC nor submitted his contracts to it prior to the convention.

When the convention assembled in December 1978, it had received only King's contracts for the Arguello-Escalera and Arguello-Chacon fights. The convention nevertheless set these contracts aside, and decreed that in accordance with its mandatory title defense rule, Arguello would have to fight Rafael "Bazooka" Limon before he could fight Escalera. Soon thereafter, Brenner telephoned Sulaiman, informing him that he had signed contracts for an Arguello-Escalera bout to take place in February 1979. Although the convention had set aside King's contracts for the same fight, Sulaiman promised to reintroduce the matter and thereby aid Brenner in his attempt to establish himself as an independent promoter. After reconsideration, the convention agreed to allow Brenner's Arguello-Escalera bout to take precedence over a Limon bout provided that, *inter alia*, Brenner settled the dispute over the promotion of the fight with Don King in court or by agreement.

Thereafter, Brenner and his attorneys sought to resolve the matter by attempting to prove that King's claims to the fight were invalid. First Brenner and then Roman, Arguello's manager, wrote to Sulaiman challenging the validity of King's contracts. By mid-December 1978, Sulaiman had in his possession both Brenner's and King's contracts for the fight as well as Brenner's exclusive service contract with Arguello. Sulaiman did not, however, side with either of the promoters, but adhered to the terms laid down by the convention. He reiterated this position to Escalera's manager, Ruiz, who, like Brenner and Roman, had attempted to persuade Sulaiman to declare King's contracts invalid. Certainly, Sulaiman owed no duty to Brenner to referee this contest.

Once it was evident that Sulaiman would not become involved in determining the validity of the contracts, Brenner attempted to settle with King. He did not negotiate directly, but elicited the assistance of Bob Arum and Sulaiman. Acting as intermediary, Sulaiman was able to persuade King to cut his demand in half. When Brenner was informed of King's counter-offer of a $25,000 settlement he indicated that he would handle the remaining negotiations. Brenner, however, waited one month, until almost the eve of the fight to contact King and to formalize the agreement. During that time, he had instituted a suit seeking to enjoin King from interfering with his promotion of the fight. After the injunction was denied, Brenner sent King a letter confirming the agreement and enclosing a postdated check.

Throughout this period, King was attempting to undermine Brenner's ability to promote the fight. First he submitted his fight contracts to CBS, causing the network to cancel its television contract with Brenner. In addition, upon receipt of Brenner's postdated check, King attempted to convince Sulaiman to cancel the fight. Sulaiman refused, adhering to the convention's decision to award Brenner the rights to the

fight. When this approach failed, King sent Sulaiman a letter with a copy to Brenner, adding new terms to the agreement.

Upon receipt of King's letter, Brenner stopped payment on the check. However, he waited until two days before the fight to inform Sulaiman that payment had been stopped. The bout was held as scheduled. Yet, despite his understanding with the WBC, Brenner never paid King. Furthermore, despite repeated opportunities, he never attempted to explain to the WBC why he had not done so. Three months after the fight, Brenner was suspended by the WBC from promoting championship title fights until he explained his position to the WBC or settled with King. At no time prior to trial did Brenner avail himself of either opportunity.

This record does not support a reasonable inference of a conspiracy among appellees and King to advance the interests of King over those of Brenner. Rather, the only conclusion that can be drawn is that the WBC and Sulaiman aided Brenner: they permitted his Arguello-Escalera fight to take precedence despite having denied a similar request by King; Sulaiman acted as intermediary, upon Brenner's request, in settling the dispute with King; and Sulaiman refused to halt the fight when King so requested. Furthermore, the record is devoid of evidence that the WBC and Sulaiman actually knew at any time that King's contracts were defective, if in fact they were. Brenner claims that evidence exposing the falsity of King's claims was furnished to Sulaiman after the convention and consisted of Brenner's exclusive service contract with Arguello and the affirmations made by the managers of both fighters that Brenner was the promoter of the fight. Brenner asserts that once apprised of this evidence, Sulaiman should have disregarded the convention's instructions. We can find no conspiracy in Sulaiman's adherence to the terms laid down by the WBC convention. The WBC convention had decided to take a position of neutrality. In light of the refusal of the court and of CBS to find King's contracts invalid, we can hardly say that Sulaiman's adherence to the convention's mandate was suspect. Neither can we conclude that a determination to allow the parties to settle this matter in court or by agreement should be interpreted as conspiratorial or as the favoring of one promoter over another.

Moreover, the record belies Brenner's assertion that he was compelled to settle with King. The convention gave Brenner a choice, to resolve the dispute either in court or by settlement. Brenner pursued both paths, soliciting Sulaiman's aid in negotiating with King while he was seeking a court injunction against King. Only when his litigation failed did he agree to a settlement.

Brenner next points to the repeated attempts of Don King to undermine the fight as evidence of the conspiracy. The district court provided the answer when it said that this evidence "shows that King isn't a nice guy, the people he deals with don't think he's a nice guy but that doesn't prove that he entered into a conspiracy with Sulaiman to have Brenner suspended." Tr. at 787–7.

■ Brenner attempts to save his deficient conspiracy claim by arguing that the district court erred in allowing Don King to invoke his Fifth Amendment privilege against self-incrimination and in refusing to review the invocation of privilege on a question-by-question basis. Brenner asserts that had King been compelled to testify, sufficient evidence of a conspiracy would have been adduced below. We find no merit in this argument. The district court was aware that King was the subject of a grand jury investigation involving some of the identical claims raised by Brenner, and in its discretion determined that King would be compelled to produce potentially incriminating evidence were he forced to testify. The district court's ruling comports with the standard set forth in *Hoffman v. United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951), that "[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of

why it cannot be answered might be dangerous because injurious disclosure could result." Furthermore, contrary to Brenner's assertion, the district court did solicit challenges to King's invocation of privilege on a question-by-question basis. Brenner presented a list of questions which he planned to ask King were' he forced to testify. The district court reviewed the questions and only then concluded that King had properly invoked his Fifth Amendment privilege.[7] There is no error here.

## II. The Group Boycott Claim

Brenner first contends that his suspension by the WBC constitutes a *per se* unlawful group boycott under Section 1 of the Sherman Act, 15 U.S.C. § 1 (1976). We disagree.

 In general, group boycotts and concerted refusals to deal are considered *per se* unlawful. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959); *see Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457, 465–67, 61 S.Ct. 703, 706–707, 85 L.Ed. 949 (1941). However, in *Silver v. New York Stock Exchange*, 373 U.S. 341, 348–49, 83 S.Ct. 1246, 1252, 10 L.Ed.2d 389 (1963), the Supreme Court recognized a narrow exception to *per se* invalidity of group boycotts and concerted refusals to deal where a "justification derived from the policy of another statute or otherwise" mandates application of the rule of reason.

Based in part upon the realization that "[i]n some sporting enterprises a few rules

are essential to survival," *Hatley v. American Quarter Horse Association*, 552 F.2d 646, 652 (5th Cir. 1977), courts have been reluctant to subject the cooperative activities of sports organizations to application of the group boycott *per se* rule. Instead, some courts have confined the *per se* rule to "concerted attempt[s] by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level[,]" *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C.Cir.1978), and concluding that the concerted activity at issue did not fall within this paradigm have applied the rule of reason, *see, e.g., NASL v. NFL*, 670 F.2d 1249, at 1258 (2d Cir. 1982); *United States Trotting Association v. Chicago Downs Association*, 665 F.2d 781, 787–90 (7th Cir. 1981) (*en banc*); *Neeld.v. NHL*, 594 F.2d 1297, 1298–1300 (9th Cir. 1979); *Smith v. Pro Football, Inc.*, 593 F.2d at 1178–80 & n.22; *Mackey v. NFL*, 543 F.2d 606, 619 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1978); *Gunter Harz Sports, Inc. v. United States Tennis Association*, 511 F.Supp. 1103, 1115–16 (D.Neb.1981); *Cooney v. American Horse Shows Association*, 495 F.Supp. 424, 430 (S.D.N.Y.1980). Other courts have recognized that *Silver* creates an exception to the *per se* boycott rule for reasonably self-regulated industries and have evaluated the sports organizations' self-regulation under the tripartite test announced in *Denver Rockets v. All-Pro Management Inc.*, 325 F.Supp. 1049, 1064–65 (C.D.Cal.1971).[8] *See, e.g., Linseman v. World Hockey Association*, 439 F.Supp.

---

**7.** We also find no merit in Brenner's claims that King improperly invoked a blanket privilege, and that the district court erred in refusing to instruct the jury that it might draw an adverse inference against appellees from King's invocation of his Fifth Amendment privilege. First, it is clear from the record that King did not invoke a blanket privilege but invoked his Fifth Amendment rights on a question-by-question basis. Furthermore, since King was a nonparty witness, no adverse inference against appellees could have been drawn from his refusal to testify.

**8.** Under the *Denver Rockets* test, in order for conduct to fall within the *Silver* exception to

*per se* invalidation of group boycotts or concerted refusals to deal there must be proof that:

(1) There is a legislative mandate for self-regulation "or otherwise."

. . . . .

(2) The collective action is intended to (a) accomplish an end consistent with the policy justifying self-regulation, (b) is reasonably related to that goal, and (c) is no more extensive than necessary [and]

(3) The association provides procedural safeguards which assure that the restraint is not arbitrary and which furnishes a basis for judicial review.

*Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. at 1064–65.

1315, 1327 (D.Conn.1977); *Hatley v. American Quarter Horse Association*, 552 F.2d at 652–53.

Brenner does not dispute that professional sports organizations may fall within the *Silver* exception. Instead, he contends that *Silver* is applicable only to sports regulations which insure either that competitors will be fairly matched and will not be exposed to unreasonable risk of injury or that the contest will not be corrupted. Brenner asserts that he was entitled to judgment notwithstanding the verdict on his group boycott claim because the discipline at issue in this case was not directed at either of these objectives and, hence, was unreasonable as a matter of law. We disagree. We reject Brenner's contention that discipline imposed by a sports organization for the violation of rules and regulations aimed at achieving reasonable objectives other than participant parity, safety and league integrity serve no purpose beyond the stifling of competition. Therefore, we decline to find such discipline *per se* unreasonable. "Surely, every disciplinary rule which a league may invoke, although by its nature it may involve some sort of a restraint, does not run afoul of the anti-trust laws." *Molinas v. NBA*, 190 F.Supp. 241, 244 (S.D.N.Y. 1961); *see Hatley v. American Quarter Horse Association*, 552 F.2d at 653–54. Absent a facial showing of anticompetitive purpose underlying the adoption or enforcement of a rule, the disciplinary activity of a sports organization must be evaluated under either the *Denver Rockets* test or the rule of reason.

In the present case, Judge Metzner properly instructed the jury that it must find that appellees' conduct constituted an unreasonable restraint of trade if a fair preponderance of the evidence supported either of two conclusions: (1) that Brenner's suspension was effected by appellees to prevent him from engaging in his trade; or (2) that appellees' conduct failed to satisfy any

of the prongs of the tripartite *Denver Rockets* test. J.App. at 137a.

■ Brenner next contends that even if appellees' conduct did not constitute a *per se* group boycott he was entitled to judgment n.o.v. or to a new trial because he proved that, as a matter of law, appellees failed to satisfy various aspects of the *Denver Rockets* test. First, Brenner maintains that the district court erred in holding that he had failed to present evidence that the WBC does not fulfill an inherent need for uniformity, fairness and integrity in boxing. Brenner asserts that he presented evidence below establishing that the WBC is corrupt and that its rules are administered in an arbitrary and ad hoc fashion. We find no merit in these claims. We agree with the district court that Brenner failed to substantiate these assertions. In contrast, appellees presented overwhelming evidence that the WBC has established a system of ranking boxers and a body of reasonable rules and procedures designed to insure organized boxing competition around the world. In this regard, the WBC does not differ significantly from other sports regulatory bodies whose purpose is to insure the organized presentation of sporting events. *See, e.g., Deesen v. PGA*, 358 F.2d 165 (9th Cir.), *cert. denied*, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966); *Heldman v. United States Lawn Tennis Association*, 354 F.Supp. 1241, 1243–44 (S.D.N.Y.1973); *Molinas v. NBA*, 190 F.Supp. at 243–44.

■ Brenner next asserts that he is entitled to judgment n.o.v. or to a new trial on his group boycott claim because, as a matter of law, none of the four alleged bases for his suspension constitutes a valid ground for excluding him from the market and because the suspension notice which he received was insufficient.[9] We find both of these arguments to be without merit. On the notice issue, Sulaiman's February 15, 1979 letter to Brenner informed him of his violation of specific WBC rules and urged

---

**9.** The asserted bases for the suspension were:

 (a) Brenner violated his commitment to the WBC to pay $25,000 to Don King which was a condition to WBC certifying the Arguello-Escalera match on February 4, 1979.

 (b) Brenner failed to pay WBC the annual registration fee set for promoters.

 (c) Brenner failed to submit to the WBC his contracts with Arguello and Escalera for the match on February 4, 1979.

Brenner either to comply with these rules or to present his side of the dispute to the Grievance and Appeals and/or the Disciplinary Committees of the WBC. This notice was clearly sufficient. *Silver* requires only that Brenner be given "some form of notice and, if timely requested, a hearing." 373 U.S. at 361, 83 S.Ct. at 1259.

◼ Similarly, we cannot conclude that Brenner's failure to honor his agreements with the WBC or with its rules were improper bases under Section 1 of the antitrust laws 'for suspending him from promoting WBC world title fights. Brenner has not presented, nor can we discern, a patently anticompetitive purpose behind the adoption of the WBC's rules or its agreement with Brenner. Neither can we conclude that the executive committee which suspended Brenner was composed of competitors who stood to gain from his suspension. Accordingly, the trial court did not err in instructing the jury to determine, in accordance with the *Denver Rockets* test, whether any of the asserted bases for Brenner's suspension were reasonably related to a policy justifying self-regulation and whether Brenner was given notice of the charges and an opportunity for a hearing.

◼ Finally, Brenner asserts that he is entitled to a new trial on the group boycott claim because the trial court erred in instructing the jury that the burden was on him to prove by a fair preponderance of the evidence that the WBC had not satisfied all of the elements of the *Denver Rockets* test. Under Fed.R.Civ.P. 51, in order to raise a challenge to the jury instructions on appeal, a party must object to those instructions before the jury retires to consider its verdict. Since Brenner failed to object to the instructions below, absent plain error, he is precluded from raising this claim on appeal. *Cohen v. Franchard Corp.*, 478 F.2d 115, 122–25 (2d Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106 (1973).

◼ We have recognized that the plain error doctrine, especially in civil cases, should be applied only where the "error [is]

(d) Brenner failed to submit proof that he was registered as a promoter in any state having jurisdiction for that purpose.

so serious and flagrant that it goes to the very integrity of the trial." *Modave v. Long Island Jewish Medical Center*, 501 F.2d 1065, 1072 (2d Cir. 1974). Because *Silver* is an exception to the general *per se* invalidation of group boycotts, it is arguable that the burden should be on the defendant to satisfy the tripartite test once the plaintiff has established the existence of conduct which constitutes a group boycott or a concerted refusal to deal. Nevertheless, in light of the unsettled nature of the law in this area, the failure of the district court to place the burden on appellees in the present case was not plain error. Accordingly, we decline to grant Brenner a new trial on this ground.

### III. *Costs*

◼ Finally, we find that the taxing of costs against Brenner was a proper exercise of the trial court's discretion despite Brenner's success on appellees' counterclaim for breach of contract. *See Scientific Holding Co. v. Plessey Inc.*, 510 F.2d 15, 28 (2d Cir. 1974).