**M & H TIRE COMPANY, INC.,**
**Plaintiff,**

**v.**

**HOOSIER RACING TIRE CORPORA-**
**TION, et al., Defendants.**

**Civ. A. No. 82–0697–C.**

United States District Court,
D. Massachusetts.

March 29, 1983.

Gael Mahony, Hill & Barlow, Timothy J. Dacey, III, Boston, Mass., for plaintiff.

John R. Hally and Wm. Baker, Nutter, McClennen & Fish, Boston, Mass., for all defendants.

## OPINION

CAFFREY, Chief Judge.

Plaintiff brings this action under the antitrust laws of the United States seeking permanent injunctive relief and treble damages pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for defendants' alleged violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Court has jurisdiction of the action and the parties under 15 U.S.C. §§ 15, 22, and 26.

I. *Proceedings to Date*

Plaintiff commenced this action on March 11, 1982, alleging that the so-called "single tire rule" (described below), as adopted under the circumstances of this case, violated Section 1 of the Sherman Act in that it constituted an illegal group boycott, a tying arrangement, and a tortious interference with plaintiff's advantageous business relations.

Plaintiff sought a preliminary injunction against the use of the tire rules at the defendant tracks for the 1982 racing season. After an evidentiary hearing upon the motion on March 22, 1982, this Court denied plaintiff's motion for preliminary injunction in an opinion dated March 31, 1982.

On April 15, 1982 defendant filed a counterclaim for a declaratory judgment as to the validity under the antitrust laws of the single tire rule, as adopted in this case, and if adopted in the future.

The case was tried to this Court from December 14 through 20, 1982. At the close of its case plaintiff waived Counts 3 through 7, leaving only claims that the adoption of the single tire rule was a concerted refusal to deal, and as such was unlawful under the Sherman Act, Section 1 either *per se* (Count 1), or under the rule of reason (Count 2). Hoosier waived its counterclaim.

This opinion will constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

II. *Parties*

A. *Plaintiff*

M & H Tire Co., Inc. (M & H) is a Massachusetts Corporation with its principal place of business in Watertown, Massachusetts. M & H designs, produces, and sells racing tires for use in organized motorcar-racing competition. Marvin Rifchin is the President of M & H.

B. *Defendants*

1. Hoosier Racing Tire Corp. (Hoosier) is an Indiana Corporation with its principal place of business in Lakeville, Indiana. Hoosier also designs, produces, manufactures, and sells racing tires and does business in direct competition with M & H. Robert Newton is the President of Hoosier.

2. Bobby Summers is the New England distributor for Hoosier and resides in Connecticut.

3. New England Drivers and Owners Club (NEDOC), organized in 1970, is an unincorporated association existing under the laws of Massachusetts, with an address in Franklin, Massachusetts. NEDOC is an association many of whose members are racing-car owners or drivers who compete in organized racing events in the Northeastern United States. NEDOC is composed of many but not all, of the racing car drivers and owners who compete in the modified class at Stafford Motor Speedway, Seekonk Speedway, Thompson Speedway, and Riverside Speedway. Richard Armstrong is the President of NEDOC.

4. Stafford Springs Enterprises, Inc. is a Connecticut corporation with its principal place of business in New Britain, Connecticut. Stafford Springs Enterprises, Inc. owns and manages Stafford Motor Speedway (Stafford), in Stafford Springs, Connecticut, and promotes organized automobile racing events at that facility. Edwin Yerrington is the promoter of that track.

5. Bristol County Stadium, Inc. (Bristol County) is a Massachusetts corporation with its principal place of business in Seekonk, Massachusetts. Bristol County leases the Seekonk Speedway in Seekonk, Massachusetts. Bristol County is owned and managed by D. Anthony Venditti and his family, and has its principal place of business in Venditti's home. Through ARC (below) and Venditti, Bristol County is responsible for promoting auto racing and other events at the track.

Both Stafford and Seekonk Speedway (Seekonk) feature "short oval" or "circle" track automobile racing in various classes, including the modified class. The bulk of the participants in such racing are amateur drivers who race several times weekly during the season.

6. Auto Racing Club (ARC) is a nonprofit Massachusetts corporation. ARC was organized by Venditti and also has its headquarters in Venditti's home. ARC promotes the automobile racing conducted at Seekonk, segregating divisions, supplying insurance, handicapping racers, conducting the races, paying referees and officials, disbursing prize money from funds it received from Bristol County and promulgating rules (including the subject single-tire rule).

III. *General Background*

The present controversy grew out of a decision involving Hoosier, its dealer Summers, NEDOC, and the promoters at four major automobile race tracks, to adopt a rule requiring drivers to use a Hoosier "Budget" tire during the 1982 automobile racing season. Under this commonly called "track-tire" rule, only one brand of tire can be used at a particular track during a racing season.

A. *The Racing Tire Market*

It is not disputed that the production and sale of racing tires constitutes a distinct market in interstate commerce. Racing tires are designed for use on high performance vehicles in organized competition rather than for street or highway use. They differ from street tires, in size, construction, and materials and they require specialized equipment and technical knowledge for their manufacture.

During 1982, the active manufacturers of racing tires of the sort involved in this case were M & H, McCreary Tire and Rubber Co. (McCreary), Goodyear, and Hoosier, Firestone had largely dropped out of this market by 1982.

Traditionally, racing tires were sold by independent dealers to racing car owners and drivers. Tires were transported by dealers to the race tracks and sold directly to drivers and owners from the dealers' trucks on the day of the race. Under the open competition system which traditionally has prevailed in the racing tire market, the sales of a particular brand of tire were directly related to the success which the tire had enjoyed at recent races. As Hoosier President Robert Newton testified, sales were based on last night's or last week's results, the reasonable inference being, that upon learning that winning cars have raced with a particular tire, drivers and owners would change brands to purchase the "winning circle" brand for their own cars. Consequently, tire companies competed vigorously throughout the racing season by making technical adjustments and introducing new tires in order to improve their sales.

B. *Racing in the Northeast*

There are numerous distinct classes of racing cars, each with its own set of rules, and its own special tire needs. The most popular and prestigious class of racing in the Northeast is the modified class, which attracts the fastest cars, draws the most spectators, and pays the largest purses in the region. Technical standards for modified race cars are promulgated by the National Association of Stock Car Auto Racing, Inc. (NASCAR). NASCAR, which is not a party in this lawsuit, sanctions and administers races at those tracks that adhere to its rules and conducts a "point fund" for drivers who compile the best record in NASCAR-sanctioned events. Modified racing is conducted at Stafford, Seekonk, Riverside Park Speedway (Riverside), and Thompson Speedway (Thompson). Stafford, Thompson, and Riverside are sanctioned by NASCAR. In order to allow drivers the opportunity to compete for NASCAR points, these three tracks schedule their regular events on different days of the week so that drivers can race at each track in the course of a weekend. NASCAR does not sanction races at Seekonk, but Seekonk follows the NASCAR rule book for its modified class.

NASCAR is not a recognized sanctioning organization. The NASCAR rules regulate only sanctioned events and thus do not embody a thoroughly regulatory scheme over the tracks as a whole, or even over all modified races at the tracks. The NASCAR rules leave the tracks free to promulgate regulations regarding the equipment used by competitors. It is to be noted that NASCAR regulations do not regulate the compounds or the brands of tires to be used at NASCAR-sanctioned events.

NEDOC, as stated above, is composed of drivers and owners who race in the modified divisions at the four above-stated tracks. As is the case with NASCAR, NEDOC is not a recognized sanctioning organization. NEDOC's principal function has been to negotiate with promoters on behalf of drivers and owners. The organization

has also been a source of proposals for rules to be adopted by the tracks. Among the rules proposed were those regulating equipment such as gear and carburetor rules, as well as bans on the use of fuel injection and aluminum block engines. Rules such as these regulating equipment had the avowed purpose of enhancing participant equality.

### C. The Cost of Automobile Racing

Modified racing cars originally resembled "stock cars" sold for street use and ran on tires similar to street tires. During the 1960's, however, competitors began to refurbish their cars with special racing components that increased engine horsepower and reduced car weight. In response, tire companies began to produce wider, softer tires capable of handling greater horsepower and speed. Since 1975, the costs of modified racing have increased substantially due to more expensive engines, chassis, frames, fuel, and tires. However, according to Arute, owner of Stafford, the prize money has remained relatively stable.

Arute also testified regarding the evolution of the so-called tire problem. Commencing at a time when M & H was the only manufacturer involved in furnishing tires specially for modified racing, and continuing through a period when the several manufacturers competed to provide even faster and softer compounds creating more demands for tires and tire changes from race to race, the sport of automobile racing had allegedly become a tire race, not a driver's race. Thus, in the early years of modified racing, a relatively small recapped tire was being used by all drivers at a more reasonable cost; but as tire technology evolved and tire sizes increased to the 15-inch tread of the 1981 modified season, tires became increasingly softer and, correspondingly, faster, less durable, and more expensive. The cost of a single 15-inch modified tire, as sold by Goodyear in the 1981 racing season, was $140 and the price of the comparable tire at the beginning of the 1982 season was $170.

In an effort to control costs, promoters in the Northeast advocated track-tire rules under which all competitors at a particular track are required to race with a single brand of tire for an entire season. As early as 1972, Seekonk adopted a track-tire rule for the modified class. Three years later, Arute organized a meeting in New York City among track promoters and tire company representatives to discuss tire rules. In 1978, the Northeast Promoters Association, organized by Stafford promoter Edwin Yerrington, proposed that twenty tracks in the Northeast implement a one-brand, one-tire rule. Initially and for various reasons, drivers and owners opposed track-tire rules. The track-tire rule adopted at Seekonk in 1972 led to a driver's strike allegedly due to manufacturer failure to supply enough of the designated tires. The 1978 proposal for a twenty-track tire rule was rejected by NEDOC members, in part because they believed that the single brand rule would violate federal antitrust laws.

### IV. Facts

In 1980, Stafford's Yerrington renewed his proposal for a track-tire rule. At a NEDOC meeting held on August 5, 1980, Yerrington informed the members present that Stafford planned to impose its own track-tire rule for the 1981 season. The promoters at Seekonk, Thompson, and Riverside later made similar announcements. Following Yerrington's announcement, NEDOC selected a rules committee to investigate the adoption of a single-brand tire rule.

At the annual meeting of NEDOC held on January 6, 1981, Yerrington informed the membership that he had conducted some tire tests at Stafford. He further suggested that NEDOC itself adopt a single-brand rule. The members voted to study the feasibility of a tire rule and contact tire companies regarding their ability to supply the required tires. The day after NEDOC's annual meeting, Yerrington contacted Hoosier and McCreary to inform them of NEDOC's interest in a single-brand tire rule and to request those companies to submit proposals for such a rule. In response to Yerrington's inquiry and a subsequent request by NEDOC president Arm-

strong, Newton, president of Hoosier, replied that Hoosier was ready to recommend a suitable tire. McCreary also replied that it was willing to supply a tire for track-tire rule purposes.

At a March 3, 1981 meeting, NEDOC members voted to conduct tests to select a single-brand, low cost tire for use in modified racing. After the March 3 vote, NEDOC again contacted the tire companies, this time to request tires for testing. The date set for testing was May 1, 1981. In response, M & H questioned the legality of the rule and the fairness of the proposed test in a memorandum to NEDOC dated April 19, 1981.

M & H agreed to submit tires for testing, but otherwise refused to participate in the NEDOC program until the issues of legality and fairness were addressed. NEDOC did not attempt to answer M & H upon these issues.

The May 1, 1981 test was cancelled because only two volunteer drivers and two tire companies appeared. As a result, NEDOC did not adopt a tire rule for the 1981 season.

NEDOC again tried to implement a tire rule in the fall of 1981. On October 1, 1981, the NEDOC Rules Committee met with representatives of Hoosier, M & H, Goodyear, and McCreary to discuss a tire rule for the 1982 racing season. Armstrong informed each tire company representative that the company whose tire was chosen would be required to supply all the tires needed at the four tracks where NEDOC members raced at a guaranteed price for the entire 1982 season. Armstrong also told the tire company representatives that NEDOC required a tire in the $90–$100 range, about $40–$50 less than the prevailing price for modified tires during the 1981 season.

NEDOC conducted two tire tests at Stafford in the fall of 1981: the first in September or October; and the second on November 7. That organization did not adopt any written procedures for conducting the tire tests prior to the beginning of testing. According to the testimony, NEDOC gave relatively short notice of the first test, so that

M & H had only a four-year old tire available and Goodyear was unable to produce a tire in the required size in time for the first test. Armstrong did, nevertheless, use the available tires from these two companies for testing purposes.

The first test was held at Stafford and took about two to two and one-half hours. Three cars participated and four tire companies: Hoosier, M & H, Goodyear, and McCreary. Notes were taken regarding the testing by Richard Armstrong's wife as well as by Robert Garbarino, Chairman of the Rules Committee.

On the basis of the first day of testing, it was Armstrong's opinion that at least two of the tires might meet NEDOC's requirements: The Hoosier Budget Tire and the M & H 91.

The second day of testing took place on November 7, 1981 and took one and one-half to two hours. Two different cars participated in the second test and were driven by two different drivers. The same four tire companies took part although not necessarily using the same tires that had been used in the first test. Both M & H and Goodyear furnished new tires for the second test. NEDOC did not inform Goodyear or M & H that the new tires had to be tested twice for "repeatability" in order to be considered for the NEDOC rule. According to Armstrong's testimony he believed the tire companies knew or should have known this fact without being told. In any event, neither the M & H 91 nor M & H's new tire were tested a second time.

After the second test, NEDOC solicited and received bids from the four tire companies. The Rules Committee then selected the Hoosier 13-inch Budget Tire for use in modified racing during the 1982 season.

On November 23, 1981, the NEDOC Rules Committee met with Stafford promoter Yerrington, the original proponent of the track-tire rule. Yerrington, however, was reluctant to adopt the proposed rule unless the promoters at the other area tracks also agreed to implement the rule. At Yerrington's request, the Rules Committee ar-

ranged a meeting at the Howard Johnson's Motor Lodge in Warwick, Rhode Island on December 17, 1981 attended by Stafford promoter Yerrington, Seekonk promoter D. Anthony Venditti, and Irving Potter, president of NEPRA, the promoter at Thompson and Riverside. At the meeting, the promoters and NEDOC officials unanimously agreed to require all cars in the modified division to use the Hoosier 13″ Budget tire for the 1982 season.

In order to be assured that Hoosier had the capacity to supply the required number of tires, members of the Rules Committee, NEDOC President Armstrong, and Seekonk promoter Venditti visited the Hoosier plant in Lakeville, Indiana on January 15, 1982.

At NEDOC's 1982 Annual Meeting held on January 19, 1982, the Rules Committee reported on the selection of the Hoosier Tire and the visit to the Hoosier plant. On January 28, 1982, NEPRA President Potter withdrew from the tire rule agreement because of the advice of counsel to the effect that the tire rule could cause antitrust problems. On February 18, 1982, NEDOC held a Special Car Owners Meeting to discuss rule changes and immediately after that, on March 11, 1982, M & H filed the present suit. At the start of the 1982 season, both Seekonk and Stafford enforced the Hoosier tire rule. Problems with the Hoosier tire began to surface, soon after the season began. Despite attempted modifications, the problems persisted and consequently, Stafford abandoned the tire rule on August 6, 1982. Seekonk continued to enforce it through the 1982 season.

## V. Applicable Law

The issue in this case is whether the Hoosier track-tire rule proposed by NEDOC and enforced at Stafford and Seekonk during the 1982 season constituted a group boycott of non-tire rule tires, having the express purpose as well as the effect of restraining competition in the manufacture and distribution of modified class racing tires in violation of Section 1 of the Sherman Act. Section 1 of the Sherman Act provides, in relevant part, that

> Every contract, combination ... or conspiracy in restraint of trade or commerce among the several states, ... is declared to be illegal ....

15 U.S.C. § 1.

This case requires the Court to consider: 1) whether the legality of the track-tire rule is governed by a *per se* rule or by the rule of reason, and; 2) whether the track-tire rule, if tested by the rule of reason, is a reasonable restraint. On the basis of each test considered separately, I rule the tire rule violates the Sherman Act.

### A. Per Se Illegality

#### 1. Conspiracy

Section 1 of the Sherman Act requires that there be concerted action among businessmen from which the Court or jury can reasonably infer that the participants had a conscious commitment to a common scheme designed to achieve an unlawful objective. *Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 111 (3d Cir.1980).

I find that on December 17, 1981, there was a meeting at the Howard Johnson Motor Lodge in Warwick, Rhode Island, attended by members of the NEDOC Rules Committee and by the promoters at Stafford, Seekonk, Thompson, and Riverside. At that meeting, NEDOC President Richard Armstrong proposed that the tracks adopt a Hoosier tire rule. I also find that the promoters unanimously agreed with Armstrong's recommendation and that the Hoosier tire rule was thereafter enforced at Stafford and Seekonk. NEPRA, the promoter at Thompson and Riverside, withdrew from the Hoosier tire rule only after its attorney advised that participation in the tire rule could cause legal problems.

Despite this uncontroverted evidence of coordinated behavior, the defendants maintain that the adoption of the Hoosier tire rule was a separate and unilateral decision on the part of each track. I find no such separate or unilateral decision. Defendants' position ignores both the law of illegal combinations and the evidence at trial.

■ Proof of a combination or conspiracy under Section 1 of the Sherman Act does not require the existence of an express agreement. In the leading case of *Interstate Circuit Inc. v. United States*, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939) the Supreme Court ruled that it was "enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." *United States v. Paramount Picture, Inc.*, 334 U.S. 131, 142, 68 S.Ct. 915, 921, 92 L.Ed. 1260 (1948); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. Container Corp. of America*, 393 U.S. 333, 337, 89 S.Ct. 510, 512, 21 L.Ed.2d 526 (1969); *Sweeney & Sons, Inc. v. Texaco, supra.*

The evidence at trial proved that concerted action was contemplated, invited, and adhered to. New England promoters had been attempting to institute track-tire rules since 1972, when Venditti introduced such a rule at Seekonk. According to Joseph Jacobs, Manager of Racing for McCreary Tire and the self-proclaimed inventor of track-tire rules, track rules permit promoters to offer competitors some relief from the escalating costs of racing without increasing prize money.

However, I find that to introduce a track-tire rule successfully, the promoter must have the acquiescence of the drivers who regularly race at his track. Drivers have the power to undermine unwanted rules by staying home, as they did in 1972, when Venditti introduced a tire rule at Seekonk. Moreover, when a promoter adopts a track-tire rule at a NASCAR-sanctioned track, he risks the wrath of drivers who travel from track to track in pursuit of point money, and who resent having to purchase special equipment to race one track. Thus, the promoters have a strong incentive to coordinate their tire rules with each other and with car owners.

In this case, I find that the invitation to concerted activity was first extended by Yerrington on August 5, 1980, when he informed a meeting of NEDOC car owners that he planned to implement a track-tire rule at Stafford for the 1981 season. Yerrington renewed this invitation in January 1981, when he told the Annual Meeting of NEDOC that NEDOC should adopt its own tire rule. Later, the promoters at Seekonk, Thompson, and Riverside informed NEDOC that they too would adopt track-tire rules unless NEDOC acted.

I find that the NEDOC membership, concerned that the tracks would adopt inconsistent rules, formed a committee to investigate available tires. The Committee met with representatives of major tire companies, conducted two tests at Stafford, solicited bids from the tire companies, and decided to recommend that the tracks adopt the Hoosier 13-inch Budget tire for the 1982 season.

As soon as the NEDOC committee selected the Hoosier Budget tire, it met with Yerrington, the original proponent of the rule. Yerrington was reluctant, however, to commit Stafford unless promoters at the other three area tracks also agreed. NEDOC then summoned the promoters to the December 17 meeting at the Howard Johnson Motor Lodge, at which I find that it was unanimously agreed by the four race facilities promoters to adopt the NEDOC proposed Hoosier 13-inch Budget tire for the 1982 racing season.

I rule that from this evidence it is clear that, for purposes of the Sherman Act, NEDOC and the tracks contemplated and participated in concerted action to adopt the Hoosier tire rule.

I further find that Hoosier participated in the combination between NEDOC and the track promoters. Among the actions that I find were taken by Hoosier to insure that its Budget tire would be designated by NEDOC are the following. Hoosier offered to participate in the tire test originally scheduled for May 1, 1981. Hoosier representative Bobby Summers attended the meeting between NEDOC and the tire companies on October, 1981. Hoosier submitted tires for testing at the two tire tests held in the fall of 1981. After the tire tests, Hoosier submitted a bid. Hoosier agreed to hold the

retail price at a specified price for the entire 1982 season and to supply all the tires needed at the four New England tracks where NEDOC members raced. Newton invited NEDOC and the track promoters to visit Hoosier's plant in Lakeville, Indiana. After the racing season began Hoosier, at the request of NEDOC, made technical changes in its track tire. From this evidence, the Court finds that Hoosier as well as NEDOC and the tracks participated in a combination within the meaning of Section 1.

■ Contrary to defendant's assertions, the conspiracy was not terminated as of February 18, 1982, when Seekonk and Stafford became aware of NEPRA's withdrawal from the track-tire rule agreement. The conspiracy existed as of December 17, 1981 and continued until the end of the 1982 racing season at Seekonk, the last remaining track operating pursuant to the conspiracy. The withdrawal of various conspirators along the way did not affect the existence of the conspiracy itself which continued until its objectives were fulfilled. Accordingly, I rule that plaintiff has proved that NEDOC, the tracks and Hoosier shared a mutual commitment to an anticompetitive course when they contemplated and participated in a concerted action to adopt the Hoosier tire rule to the exclusion of all competing tires.

2. Group Boycott

■ While the language of Section 1 is broad enough to render illegal many commercial understandings, the Supreme Court in *Standard Oil of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 55 L.Ed. 834 (1911), established the "rule of reason" as the prevailing mode of analysis. Under this rule, the fact finder balances all the circumstances of a case in deciding whether a restrictive practice is illegal under the Act as an unreasonable restraint on competition. The analysis required by the rule of reason, however, is laborious, and as the courts gained experience with antitrust problems they identified certain types of agreements that were so

consistently unreasonable that they could be deemed illegal *per se,* without exhaustive inquiry into their purported justifications. *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Among the practices that have been deemed so pernicious as to be unreasonable *per se* are group boycotts. *United States v. General Motors Corp.,* 384 U.S. 127, 145–46, 86 S.Ct. 1321, 1330, 16 L.Ed.2d 415 (1966); *Radiant Burners, Inc. v. Peoples Gas Light and Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 212–13, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *See Silver v. N.Y. Stock Exchange,* 373 U.S. 341, 347, 83 S.Ct. 1246, 1251, 10 L.Ed.2d 389 (1963). The classic group boycott, deserving of *per se* condemnation, is an agreement designed to eliminate competition by a concerted refusal to purchase from or sell to the business rivals of one or more of the conspirators. *United States v. General Motors Corp., supra,* 384 U.S. at 140, 86 S.Ct. at 1327; *Klor's Inc. v. Broadway-Hale Stores, Inc., supra,* 359 U.S. at 213, 79 S.Ct. at 710.

■ The tire rule agreed upon by Hoosier, NEDOC, Stafford Springs, and Seekonk represents precisely such an agreement: a group of purchasers (the NEDOC members) combined with a group of middlemen (the track promoters) and with one supplier (Hoosier) to eliminate all competition for the sale of racing tires at the affected tracks. The adoption of the track-tire rule in effect enabled Hoosier to foreclose other racing tire manufacturers from the most popular class of racing at some of the most prestigious tracks in the Northeast.

Defendants argue correctly that the circumstances of this case do not fit the traditional parameters of horizontal group boycott activity. The traditional definition of group boycott is a concerted attempt by a group of competitors at one level to protect themselves from competition from nongroup members who seek to compete at that level. *Klor's Inc. v. Broadway-Hale*

*Stores, Inc., supra,* at 212, 79 S.Ct. at 709; *Brenner v. World Boxing Council,* 675 F.2d 445, 454 (2d Cir.1982). In other words, the agreement is "between business competitors in the traditional sense." *Mackey v. National Football League,* 543 F.2d 606, 619 (8th Cir.1976). Defendants claim, in effect, that a group boycott would exist in this case only if two or more tire companies joined together to eliminate a third.

Defendants' argument overlooks however, the clear teaching of *Klor's, Inc. v. Broadway-Hale Stores, Inc., supra,* 359 U.S. at 207, 79 S.Ct. at 705. In that case, Klor's operated an appliance store next door to one of the outlets of Broadway-Hale. Klor's alleged that Broadway-Hale had conspired with major manufacturers and distributors of appliances not to sell to Klor's. The Supreme Court held that the conspiracy between Broadway-Hale and the manufacturers and distributors of appliances constituted a *per se* violation of Section 1 of the Sherman Act, even though the conspiracy involved only a single retailer and was directed at only a single competitor. The case of *United States v. Ciba Geigy Corp.,* 508 F.Supp. 1118 (D.N.J.1976), is also relevant on the issue whether to treat business arrangements as horizontal or vertical for purposes of group boycott analysis. In *Ciba Geigy* there were a series of supply agreements which limited the range of uses to which a purchaser was entitled to put sold material. Although the contracts were reached in a vertical, supplier-purchaser contract, the Court found that they in fact were designed to limit horizontal competition between Ciba and its vendees. The Court further held that where it is shown that a vertically imposed restraint is intended to suppress horizontal competition, the agreement is the equivalent of a horizontal restraint of trade. *United States v. Ciba Geigy Corp., supra,* at 1146.

Defendants claim that the arrangement among NEDOC, the track promoters and Hoosier is analogous to a vertical relationship, and that vertical agreements are illegal *per se* only if their purpose is price fixing. *Products Liability Insurance Agency, Inc. v. Crum & Forster Insurance Com-*

*panies,* 682 F.2d 660, 663 (7th Cir.1982). The combination among NEDOC, the tracks, and Hoosier bears little resemblance to the vertical relationship between manufacturer and dealer dealt with in the leading case of *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 52–54, 97 S.Ct. 2549, 2558–60, 53 L.Ed.2d 568 (1977). Moreover, even if the proposed analogy to vertical relationships were apt, the combination among the defendants' would still be illegal *per se,* because the aim of the tire rule was unmistakably to fix prices.

At the meeting between NEDOC and the tire companies on October 1, 1981, NEDOC informed each of the tire companies that it expected them to guarantee a fixed price of between $90 and $100 for the upcoming season. To achieve this goal, it was necessary to adopt track rules designating a single brand of tire at a stated price. Only through single-brand rules could NEDOC and the tracks assure themselves that the price of racing tires would not rise over the course of a season through the introduction of new, more successful, and accordingly more expensive products.

The evidence demonstrates, therefore, that a group of purchasers combined with two track promoters and a tire company to fix the maximum price of tires by eliminating competition from other sellers. I rule that this combination is in fact "within the undeniably anti-competitive *per se* boycott paradigm." *U.S. Trotting Assoc. v. Chicago Downs Assoc. Inc.,* 665 F.2d 781, 790 (7th Cir.1981).

### 3. Sports Self-Regulation

Defendants argue that this case is a case of attempted sports self-regulation by a sports organization, and that the rule of reason, not the *per se* rule is uniformly applied to such cases of self-regulation.

The Court notes in the first instance that sports other than baseball are subject to the antitrust laws, *Flood v. Kuhn,* 407 U.S. 258, 276–83, 92 S.Ct. 2099, 2109–12, 32 L.Ed.2d 728 (1972), and among the antitrust restrictions that apply to sports are prohibi-

tions against group boycotts. *Washington State Bowling Proprietors Assoc. v. Pacific Lanes Inc.,* 356 F.2d 371, 376 (9th Cir.1966); *Blalock v. Ladies Professional Golf Assoc.,* 359 F.Supp. 1260, 1264–68 (N.D.Ga.1973).

█ There has been judicial recognition, however, that in professional sports, unlike many other forms of business competition, "a few rules are essential to survival," *Hatley v. American Quarter Horse Assoc.,* 552 F.2d 646, 652 (5th Cir.1977), and accordingly courts have been reluctant automatically to subject the cooperative activities of sports organizations to application of the group boycott *per se* rule. *Brenner v. World Boxing Council,* 675 F.2d 445, 454 (2d Cir.1982). These cases all recognize that the legitimate goal of such sports regulation is the preservation of participant parity and competitive equivalency,[1] and some courts have chosen a more extended analysis of the administrative regulations of sports organizations which focuses on the purpose of the regulation and the procedures followed in adopting it. *See, e.g., Brenner v. World Boxing Council, supra* at 454–55. The cases do not, however, give sports organizations unlimited discretion in adopting rules and regulations. First, it has been generally recognized that when the purpose of a sports regulation is to eliminate business competition, the concerted action is not eligible for rule of reason analysis and must be subjected to *per se* treatment. *See, U.S. Trotting Assoc. v. Chicago Downs Assoc., supra* at 788–89; *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1177–80 (D.C.Cir.1978); *Blalock v. Ladies Professional Golf Assoc., supra,* at 1265–68.

█ Second, recent cases have recognized that sports regulations must satisfy basic tenets of procedural fairness. Accord-

ing to the three-pronged test announced in *Denver Rockets v. All-Pro Management Co., Inc.,* 325 F.Supp. 1049, 1064–65 (C.D.Cal. 1971), a sports regulation can escape *per se* treatment only if: 1) there is a legislative mandate for self-regulation, or otherwise, and; 2) the collective action is intended to achieve an objective consistent with the policy justifying self-regulation, is reasonably related to that objective, and is no more extensive than necessary, and; 3) the governing organization provides procedural safeguards to protect against arbitrary restraints and to provide a basis for judicial review. *Accord, Brenner v. World Boxing Council, supra,* at 454–55; *Gunter Harz Sports, Inc. v. United States Tennis Assoc.,* 511 F.Supp. 1103, 1116 (D.Neb.), *aff'd,* 665 F.2d 222 (8th Cir.1981); *Linseman v. World Hockey Assoc.,* 439 F.Supp. 1315, 1321 (D.Conn.1977).

█ The Hoosier track-tire rule does not meet these standards for several reasons. First, the objective of the rule is plainly to fix prices. NEDOC recommended the adoption of the tire rule in order to fix the price of modified racing tires in the range of $90–$100 for the 1982 season. Price-fixing even to achieve a legitimate goal such as competitive equivalency is not an objective of sports regulation.

Second, the goal of fixing the price of modified racing tires was achieved by designating one tire company as the sole supplier of tires, thereby eliminating all inter-brand competition at the affected tracks. The Court is not aware of any case that has approved the elimination of inter-brand competition as a legitimate form of sports self-regulation.

---

1. *Brenner v. World Boxing Council,* 675 F.2d 445 (2d Cir.1982); *North American Soccer League v. National Football League,* 670 F.2d 1249, 1258–59 (2d Cir.1982); *U.S. Trotting Assoc. v. Chicago Downs Assoc., Inc.,* 665 F.2d 781, 789–90 (7th Cir.1981); *Gunter Harz Sports, Inc. v. U.S. Tennis Assoc.,* 511 F.Supp. 1103, 1115–16 (8th Cir.1981); *Hatley v. American Quarter Horse Assoc.,* 552 F.2d 646, 652 (5th Cir.1977); *Neeld v. NHL,* 594 F.2d 1297, 1298–1300 (9th Cir.1979); *Mackey v. NFL,* 543 F.2d 606, 619 (8th Cir.1976), *cert. denied,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); *Cooney v. American Horse Shows Assoc.,* 495 F.Supp. 424, 430 (S.D.N.Y.1980); *Denver Rockets v. All-Pro Management Inc.,* 325 F.Supp. 1049, 1064–65 (C.D.Cal.1971); *STP Corp. v. U.S. Auto Club, Inc.,* 286 F.Supp. 146 (S.D.Ind. 1968).

Third, the rule was not adopted by an independent sanctioning organization interested in the health of the sport as a whole. The defendants admit that neither NEDOC, NEPRA nor NASCAR (the latter two not parties to this suit) is the recognized sanctioning organization governing amateur and/or professional automobile racing in the Northeast. Defendants contend that "short oval" automobile racing lacks the formal overall regulatory scheme of such sports as football and basketball, and that the tracks themselves are the customary and primary source of the rules and regulations governing their races in the various divisions. Defendants would have the Court hold that each race track is itself a recognized sanctioning organization for purposes of antitrust analysis. That position is not supportable in law. If the Court were to hold that any sports organization lacking in overall regulatory scheme were exempt from *per se* application of the antitrust laws, it would in effect extend to such independent sports groups *carte blanche* permission to adopt any rules they chose regardless of the anticompetitive effect. The weight of the antitrust law, on the contrary, suggests that if sports associations wish to avoid strict application of the antitrust laws, they must organize and create sanctioning bodies whose responsibility it is to insure the integrity and continuity of the sport.

Defendants claim that the existence of a formal sanctioning body is not formally required by law before defendants can claim the benefit of the rule of reason holdings in the sports cases. Defendants argue that to impose such requirement is tantamount to forcing defendants to conspire (i.e. to form a league or sanctioning body) before they could further conspire (i.e. under the aegis of such a league) to adopt a reasonable rule. Defendants assert that the situation of the unorganized tracks here is analogous to local golf clubs who in conjunction with their membership adopt rules respecting permitted equipment. The Court suggests that were all the major golf clubs in the Northeast to decide as a group that, to insure competitive equivalency among golf-ers, they would adopt a rule designating one brand of golf club to be manufactured by one company; and were the clubs further to agree that no golfer without the designated brand could play in tournaments at those clubs, there would be an antitrust problem in that situation as serious as the one in this case.

Fourth, the procedures followed by NEDOC in arriving at the Hoosier tire rule lacked procedural fairness. The notice given to the tire manufacturers of the tests held in the fall of 1981 was inadequate; the tire manufacturers were not informed of key criteria used in judging the tires; the procedures followed during the tire tests were hit or miss as well, in that they failed to account for relevant variables and were not adequately recorded. Moreover, from the scanty NEDOC records which survived, it is not possible for the Court to determine why NEDOC thought that the Hoosier Budget tire was superior to other tires tested, such as the Goodyear M–23 or the M & H 91 and 95. *Compare Silver v. New York Stock Exchange, supra,* 373 U.S. at 362–363, 83 S.Ct. at 1259 (discussing importance of procedural due process as providing a basis for judicial review).

The Court fully supports the proposition that professional sports need some rules preferably ones superior to the law of the jungle in order to survive. However, that proposition does not legalize the track-tire rule under the circumstances of this case, since it is a device designed by a group of purchasers to fix the price of tires by eliminating inter-brand competition. This Court accordingly rules that the track-tire rule proposed by NEDOC and enforced at Stafford and Seekonk during the 1982 racing season constituted a group boycott in *per se* violation of Section 1 of the Sherman Act.

### B. *Rule of Reason*

I further rule that even if judged under the rule of reason, the track-tire rule violated the antitrust laws. Under the rule of reason, a restraint must be evaluated to determine whether it is significantly anticompetitive in purpose or effect.

In making this evaluation the Court will analyze "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978); *Smith v. Pro Football, Inc., supra,* at 1183. If, on analysis, the restraint is found to have legitimate business purposes whose realization serves to promote competition, the anticompetitive evils of the challenged practice must be balanced carefully against its procompetitive virtues to ascertain whether the former outweighs the latter.[2] A restraint is unreasonable if it has the net effect of substantially impeding competition.[3]

 The Court notes that the more carefully considered sports regulation cases have applied a very restricted version of the rule of reason. Under the test announced is *Denver Rockets, supra,* a sports regulation that seeks an improper objective, or is overly broad, or was not adopted pursuant to fair procedures, is condemned as a *per se* violation of the antitrust laws without further inquiry into its ultimate economic consequences. In this respect, the *Denver Rockets* decision follows the teachings of the Supreme Court in *Silver v. New York Stock Exchange, supra,* 373 U.S. at 364–65, 83 S.Ct. at 1260. As analyzed by the Court above, the Hoosier tire rule fails the *Denver Rockets* test and is therefore illegal *per se.*

Defendants argue that the *Denver Rockets* case is not applicable in the present context. They argue that *Denver Rockets* involved a situation in which the particular restriction entirely precluded the complainant from the market in question, in that the rule was adopted by a sporting association whose determination then became binding on every competitor in the league. Defendants contend that in the instant case, the challenged rule-making activities were done on a single or two-track basis and that plaintiff was not precluded from doing business with the other two tracks who withdrew from the track-tire rule prior to the opening of the 1982 season. Defendant argues that whether or not the adoption of the rule was joint as between Seekonk and Stafford, it was certainly confined to those two tracks alone and did not have any further exclusionary effect.

 The Court has found *supra* that the December 17, 1981 meeting resulted in a conspiracy among all four major Northeast automobile racing tracks to adopt the tire rule, and that the conspiracy continued until the end of the 1982 racing season. Accordingly, M & H was initially foreclosed from the tire market at all four tracks, and ultimately foreclosed from 50 percent of the market during most of the 1982 season. The exclusionary effect of foreclosure from even 50 percent of the market is significant and substantial for purposes of antitrust analysis.

Defendants further object to the use of the *Denver Rockets* case on the grounds that it is now a largely outmoded analytic approach to the avoidance of *per se* rule. The more modern analysis, defendants suggest, is reflected in the First Circuit's recent case, *Allied International, Inc. v. ILA,* 640 F.2d 1368 (1st Cir.1981). *Allied* involved a suit by a Massachusetts importer of wood products from the Soviet Union

---

**2.** *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977), *citing Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918) (under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition"). *Cf. id.* at 50 n. 16, 97 S.Ct. at 2558 (in determining whether a particular commercial practice should be prohibited *per se,* "[t]he probability that anticompetitive consequences

will result from [the] practice and the severity of those consequences must be balanced against its pro-competitive consequences").

**3.** *See National Society of Professional Engineers v. United States,* 435 U.S. at 691, 98 S.Ct. at 1365, *quoting Chicago Bd. Of Trade v. United States,* 246 U.S. at 238, 38 S.Ct. at 244 ("The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.").

against the longshoremen's union for refusing to unload a Soviet ship in a United States harbor as a protest against the Soviet Union's invasion of Afghanistan.

■ *Allied* involves a politically motivated boycott. In this regard it is similar to the case of *Missouri v. National Organization of Women, Inc.*, 620 F.2d 1301 (8th Cir.1980) which involved a boycott of all convention facilities in states that had not ratified the equal rights amendment. In neither of these cases did the Court apply the Sherman Act. As stated by those Courts, and as stated above by this Court, the Act is aimed primarily at combinations having commercial objectives and should be applied sparingly to organizations that normally have other objectives such as labor unions, political lobbying groups, or sports associations.

Contrary to defendants contentions, however, the case at bar is not appropriately analyzed within a political framework such as the one in *Allied* or *Missouri*. It is appropriately analyzed within the rule of reason framework as it is established in the sports regulation cases including *Denver Rockets* and its progeny.

■ Moreover, even under the extended rule of reason analysis advocated by the defendants, the Hoosier track-tire rule must fail. Analysis under the rule of reason starts from the premise that the Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services. *National Society of Professional Engineers v. United States, supra*, 435 U.S. at 695, 98 S.Ct. at 1367. The purpose of a rule of reason analysis is to form a judgment about the competitive significance of the restraint. And practices which are unreasonably restrictive of competitive conditions must be condemned, even though they have beneficial effects in other areas.

In this case there was evidence in the form of testimony from Dr. Dalton, that multi-track tire rules have a detrimental impact on competition in the racing tire market. Although the racing tire market is relatively concentrated with only four or five active suppliers, it is nevertheless highly competitive, primarily because, according to Dr. Dalton, open competition gives tire manufacturers the opportunity and the incentive to innovate. Track-tire rules eliminate competition over the course of the season and substitute, instead, the designation of a single tire made from less-expensive material. Such rules lessen both the incentive and the opportunity to innovate. Such rules also raise barriers to entry into the market and increase opportunities for collusion, although there was no evidence of collusion in this case. Thus, in the long run, these rules are likely to lead to higher prices and lower-quality tires.

■ Defendants have offered the testimony of certain drivers who claim to prefer competition under track-tire rules. No doubt many drivers are in favor of such rules because under the Hoosier tire rule, the price of tires was approximately $50 less in 1982 than in 1981. In our economy, however, prices are set by the impersonal forces of competition, and not by consumer preference. Furthermore the law protects the impersonal forces of competition, rather than consumer preference, on the basis that economic forces will ultimately enhance consumer welfare. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 n. 10, 97 S.Ct. 690, 696 n. 10, 50 L.Ed.2d 701 (1977); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979).

The defendants also seek to justify tire rules as essential to controlling the cost crisis in racing. The evidence at trial, however, indicated that the cost crisis affects not only racing tires, but also racing engines, racing chassis, gasoline, and other components as well. The evidence further demonstrated that one of the reasons for the crisis is that purses offered by track promoters have not kept pace with the every-day cost of racing an automobile. Alternative approaches to the cost crisis could include increased purses, objective specifications restricting engine performance, or

some more reasonable approach to tire specification.

In sum, the evidence at trial did not demonstrate that the Hoosier tire rule was essential to the survival of professional auto racing as a sport, or that, over time, such a tire rule would effectively cut costs at all.

Defendant argues that when a restraint is challenged under the rule of reason, the plaintiff has the burden of establishing not only that the restraint is unreasonable but also a relevant geographic and product market within which to measure the effect of the restraint. *Gough v. Rossmoor Corp.,* 585 F.2d 381 (9th Cir.1978) (the restraint, even if unreasonable, must adversely affect competition and not merely one competitor); *Dougherty v. Continental Oil Co.,* 579 F.2d 954 (5th Cir.1978) (must evaluate the operation of the restraint in the context of a defined geographic and product market).

As stipulated among the parties, the relevant product market was racing tires. Plaintiff has established that the relevant geographic market was the Northeastern United States. Plaintiff further established that there are four major New England race tracks that conduct such racing. Defendants contend that in addition to the four defendant tracks there were other tracks in New England that conduct modified racing. Since no sales data was furnished on tire sales at those tracks, defendant argues that plaintiff has failed to establish a defined geographic market. The Court holds, to the contrary, that plaintiff has made out a prima facie case under the rule of reason of "proof of a well-defined relevant market upon which the challenged anticompetitive actions would have had a substantial impact." *Dougherty v. Continental Oil Co., supra,* at 963. Plaintiff has presented evidence that there are four *major* tracks in the Northeast that conduct automobile racing in the modified class. Defendant has presented no convincing evidence to the contrary and therefore plaintiff adequately established the existence of a relevant market.

Accordingly, the Court rules that under a rule of reason analysis, the Hoosier track-tire rule as it existed in 1982 had severe anticompetitive effects and demonstrated insufficient procompetitive virtues, and that it therefore unreasonably restrained trade in violation of Section 1 of the Sherman Act.

## VI. *Damages*

■ Once the fact of injury to the plaintiff has been established, the amount of damages may be fixed by the trier of fact according to a just and reasonable estimate of the damages based on relevant data, including both probable and inferential, as well as direct and positive proof. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); *see Storey Parchement Co. v. Patterson Parchement Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

At Thompson and Riverside in 1982 where open tire competition was permitted, M & H, according to Rifchin and Garuti, his distributor, sold approximately 40 percent of the tires sold at Riverside and approximately 60 to 65 percent of those sold at Thompson. Potter, the promoter at those two tracks, contradicted this testimony. Potter testified that in the beginning of the 1982 season M & H had a 45 to 50 percent share of sales at those two tracks but that, by the end of the season, that figure had declined to approximately 35 percent. According to Potter's testimony, Goodyear had the major portion of the tire market for the modified class in 1981 when drivers were running on a 15-inch tire. When track promoters revised the allowable tire size on the modified division in 1982 to 13 inches, however, Goodyear was late in producing the new-sized tire, apparently giving M & H a competitive edge in the 1982 season. By the end of the season Goodyear had come out with its 13-inch tire and, according to Potter, M & H's lead was reduced.

In 1982, Hoosier sold 1,822 13-inch Budget tires for use under track-tire rules at Seekonk for the whole season and at Stafford until August 6. Rifchin testified that M & H could have supplied all these tires without purchasing additional equipment, hiring additional personnel, leasing addi-

tional space, or incurring other overhead expenses. The Court finds that, based upon Goodyear and M & H tire sales at Riverside and Thompson, it is reasonable to infer that, had the track-tire rule not been in effect, M & H would have obtained approximately 45 percent of those Hoosier sales, at a gross profit of $30 per tire equalling $24,597.[4]

VII. *Injunctive Relief*

Under Section 16 of the Clayton Act, a plaintiff is entitled to an injunction to prevent threatened loss or damage by a violation of the antitrust laws. 15 U.S.C. § 26 (1982). Injunctive relief is appropriate, even though the illegal practice has been seasonally discontinued, unless it is clear that the practice will not recur. *United States v. Concentrated Phosphate Export Assoc.*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968); *United States v. W.T. Grant*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Allen v. Medran*, 416 U.S. 802, 810–11, 94 S.Ct. 2191, 2197, 40 L.Ed.2d 566 (1974). In this case it is likely that, due to driver pressure, multi-track tire rules will be proposed and may well be adopted in the future. Track promoters have advocated such rules for over a decade, and at least two tire companies, McCreary and Hoosier, advertise the availability of tires for such rules. Moreover, successful tire rules in the modified class require the cooperation of drivers and owners. Therefore I rule that M & H is entitled to injunctive relief against multi-track, single-brand tire rules that designate in the conjunctive, one compound, one manufacturer, and one price.

Order accordingly.

## ORDER

In accordance with opinion filed this date, it is ORDERED:

1. That M & H Tire Company, Inc. is awarded single damages in the amount of $24,597 which when trebled produces a judgment for $73,791 for plaintiff.

2. Defendants are permanently enjoined from promulgating or enforcing a multi-track, single-brand tire rule which designates one compound, one manufacturer, and one tire price.

4. Total Hoosier sales (1,822 tires) × M & H market share (45%) × M & H gross profit per tire ($30) = $24,597.