**M & H TIRE COMPANY, INC.,**
Plaintiff, Appellee,

v.

**HOOSIER RACING TIRE CORPORA-
TION, et al., Defendants, Appellants.**

No. 83–1379.

United States Court of Appeals,
First Circuit.

Argued Nov. 7, 1983.

Decided May 3, 1984.

John R. Hally, P.C., Boston, Mass., with whom William H. Baker, Neil P. Motenko, and Nutter, McClennen & Fish, Boston, Mass., were on brief, for appellants.

William F. Baxter, Asst. Atty. Gen., Wayne D. Collins, Deputy Asst. Atty. Gen., Barry Grossman, Atty., Dept. of Justice, and William J. Roberts, Atty., Dept. of Justice, Washington, D.C., on brief for the United States of America, amicus curiae.

Timothy J. Dacey, with whom Gael Mahony, Richard S. Boskey, and Hill & Barlow, Boston, Mass., were on brief, for appellee.

Before CAMPBELL, Chief Judge, ROSENN,[*] Senior Circuit Judge, and BOWNES, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

This appeal arises from a determination by the district court that Hoosier Racing Tire Corporation ("Hoosier"), acting in concert with four race tracks and several driving clubs,[1] violated Section 1 of the Sherman Act. *M & H Tire Co. v. Hoosier Racing Tire Corp.*, 560 F.Supp. 591 (D.Mass.1983). We reverse. The facts are set forth extensively in that opinion, and we repeat here only the more essential ones.

## I.

The plaintiff, M & H Tire Co., Inc. ("M & H"), produces and sells racing tires. M & H filed suit after the defendant tracks and drivers had selected Hoosier, a rival, from among several producers including M & H, to be the sole tire supplier under a "single tire rule" for the "modified" class of auto racing at four tracks in the Northeast during the 1982 season. Initiated by certain promoters, the rule was proposed by the New England Drivers and Owners' Club ("NEDOC") and adopted at a meeting between NEDOC and the four tracks. NEDOC thereafter invited tire companies to submit sample low cost tires for testing and ran tests which resulted in the selection of a particular model of Hoosier as the sanctioned tire.

NEDOC is an unincorporated association composed primarily of drivers and car owners who race at Stafford, Seekonk, Riverside and Thompson speedways, the four tracks which initially adopted the rule. Be-

---

[*] Of the Third Circuit, sitting by designation.

**1.** Hoosier's co-defendants are Stafford Springs Enterprises, Inc., Bristol County Stadium, Inc., A.R.C. Auto Racing Club, Inc., New England Drivers and Owners Club, and Bobby Summers. Throughout the opinion we refer to the co-defendants, except for Summers, collectively as "the tracks and drivers." We include Summers, a Hoosier dealer, in the term "Hoosier."

cause NEDOC members raced primarily (although not exclusively) at these four tracks, they sought acceptance of the tire rule there. NEDOC hoped to have the tracks adopt a single consistent rule rather than have its members confront different rules at each track at which they raced. However, while Riverside and Thompson initially agreed to implement the rule, they withdrew their support soon after, on advice of counsel, and are not defendants to this suit.

In addition to these four tracks, the record reveals at least 15 other tracks on the East Coast that conduct "modified" class auto racing on short oval tracks, and as many as 800 short oval tracks nationwide (though the record is not clear as to how many of these tracks conduct modified racing).

In auto racing there is no formal league as is found in sports such as football or baseball. However, there is a national racing organization, the National Association of Stock Car Auto Racing, Inc. ("NASCAR"), which had no connection with the challenged tire rule and is not a party to this lawsuit. As the district court found, NASCAR promulgates certain technical standards for modified race cars; it also sanctions and administers races at tracks that follow its rules; and it conducts a point fund for drivers who compile the best records in NASCAR sanctioned events. NASCAR sanctions the races at Stafford, Riverside and Thompson but not at Seekonk (although Seekonk follows NASCAR rules). The district court found that NASCAR "is not a recognized sanctioning organization" and that its rules "do not embody a complete regulatory scheme over the tracks as a whole, or even over all modified races at the tracks." Significantly, the NASCAR rules leave the tracks "free to promulgate regulations regarding the equipment used by competitors." There are no NASCAR regulations as to tire brands or compounds.

The function of the regional NEDOC group (not to be confused with the nationwide NASCAR just mentioned) is to negotiate with promoters on behalf of its member drivers and owners. It has also been a source of proposals for rules to be adopted by the tracks where its members race. The court found,

> Among the rules proposed were those regulating equipment such as gear and carburetor rules, as well as bans on the use of fuel injection and aluminum block engines. Rules such as these regulating equipment had the avowed purpose of enhancing participant equality.

The single tire rule at issue here was adopted in a meeting between the NEDOC rules committee and the promoters of Stafford, Seekonk, Riverside and Thompson race tracks held at the Howard Johnson's in Warwick, Rhode Island, on December 17, 1981. The NEDOC officials and the track promoters unanimously agreed that all cars in the modified division should use the Hoosier 13-inch budget tire for the 1982 season. Soon thereafter, as already noted, two of the tracks withdrew on advice of counsel; and their withdrawal was followed by withdrawal of a third track (Stafford) six months later due to problems with the selected Hoosier tire. Only Seekonk continued to enforce the rule through the 1982 season.

Racing tires constitute a distinct market in interstate commerce—they are different from ordinary passenger tires. In 1982, besides M & H and Hoosier, there were only two, or possibly three, regular producers of such tires. Traditionally, racing tires are sold directly to drivers and racers at trackside, from trucks, on the day of races, with one or another brand finding favor on the basis of its success in recent races, and with considerable competition taking place, to the extent that producers would constantly make improvements and would even introduce new tires during each season to improve sales.

In the early days of modified racing, the cars resembled stock passenger cars and used tires similar to street tires. But in recent times the costs of racing have escalated as the result of more complex engines, chassis, frames, and tires. Tires,

and the compounds from which they are made, have become exceedingly sophisticated, calling for tire changes from race to race. Tire sizes among the faster tires have increased to a 15-inch tread, and they are softer, faster, less durable, and costlier. The cost of a single 15-inch modified tire in 1981 was $140 and by 1982 had risen to $170. To control these escalating costs, proposals were made by some of the tracks and promoters connected with this suit as well as others, from the early 1970's on, to require all competitors at a particular track to race for an entire season with a particular brand of tire. In 1978 Stafford promoter Yarrington tried to induce 20 Northeastern tracks to adopt such a rule, but was unsuccessful in persuading, among others, NEDOC's membership. There is evidence, however, that in the period 1979–1982 a number of Northeastern tracks other than defendants had single tire rules in effect.

The tracks and drivers here assert that they adopted a single tire rule for two purposes. First, to control the steadily increasing cost of auto racing, which threatened to reduce the field of (mostly amateur) participants, and second to promote greater parity among the competing cars. The cost savings goal was to be achieved by specifying a low cost 13-inch "budget" tire in the $90–$100 range, and the parity goal was to be achieved by designating a single permissible tire brand to insure, to the maximum extent possible, that all drivers were racing on a single rubber compound. One driver explained his reasons for wanting to race on a single compound as follows:

> Well, it took a lot of weight off your shoulders, you might say, wondering during the week, making phone calls as to which compound is going to be the best, or was it a hot setup, and trying to track down the tires. You could concentrate on racing, having fun, which is what the sport is all about, I think.
> So the competition, you could go there with a track tire, you knew everybody was on the same tire, which we were very competitive, and we were having a good time and enjoying racing. When

you get tire compound to worry about it is just an added thing, added expense. Who needs it?

The district court did not dispute these assertions. It made no finding that the rule was adopted for other, perhaps ulterior, reasons. It found that there was no evidence of collusion between the drivers and tracks and the selected tire producer, Hoosier.

Nonetheless, the district court ruled that the defendants, by adopting and implementing a single tire rule, had conducted a group boycott of M & H, which was unlawful per se. The court additionally found that the purpose of the tire rule was "unmistakably" to fix maximum prices for racing tires. And even assuming the single tire rule was not illegal per se, the district court held that the rule was invalid under a rule of reason analysis. The court permanently enjoined the tracks and drivers from passing or enforcing a "single brand tire rule which designates one compound, one manufacturer, and one tire price." *See* Section 16 of the Clayton Act, 15 U.S.C. § 26 (1982). The court also found that "M & H would have obtained approximately 45 percent of those Hoosier sales [made under the single tire rule], at a gross profit of $30 per tire equalling $24,597." After trebling the damages, the court awarded M & H $73,791.

On appeal, Hoosier and the tracks and drivers contend that the district court erred in finding a per se violation of the Sherman Act. And looking at the single tire rule under the *rule of reason*, they contend that no anticompetitive effect in a defined relevant market was established. Rather, the rule is justified in their view as a reasonable form of sports self-regulation designed to ensure participant parity and competitive equivalency.

## II. ILLEGALITY PER SE

We shall first consider the district court's determination that the single tire rule constituted a group boycott of M & H, and, as such, was illegal per se. The dis-

trict court reached this result even while acknowledging that the facts "do not fit the traditional parameters of horizontal group boycott activity." 560 F.Supp. at 601. We agree that the facts do not present a classic group boycott, *see Allied International, Inc. v. International Longshoremen's Association, AFL–CIO,* 640 F.2d 1368, 1380 (1st Cir.1981), but, unlike the lower court, believe this to be a major stumbling block to per se analysis. *See* Sullivan, *Antitrust* §§ 88–91 (1977).

### A. Being Vertical, not Horizontal, the Alleged Boycott Invites Rule of Reason Analysis

 The term "per se illegal" identifies categories of conduct for which no exculpatory justification will be entertained by a court. The courts establish such categories after they have had enough exposure to a type of conduct to conclude that most of its manifestations are so pernicious that case-by-case inquiry into possible justifications is not worth the candle. *See Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Thereafter, the finding that particular conduct falls within a proscribed category serves as a heuristic, obviating any need to determine whether the conduct is in fact harmful. It follows that care must be taken that the challenged conduct fits into a proscribed category without distortion, for it is the similarity to past conduct whose harmfulness has been settled that allows the inference, without further inquiry, that this manifestation is harmful.

Thus even when confronted with examples of conduct ordinarily considered "illegal per se," such as price fixing, the Supreme Court has eschewed per se analysis when the context was novel, and therefore outside the established categories of business behavior which experience had confirmed were anticompetitive and without redeeming virtue. *See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). A claim of boycott, such as we have here, invites particular caution: "boycotts are not a unitary phenomenon," *St. Paul Fire & Marine Insurance Co. v. Barry,* 438 U.S. 531, 543, 98 S.Ct. 2923, 2931, 57 L.Ed.2d 932 (1978) (quoting P. Areeda, *Antitrust Analysis* 381 (2d ed. 1974)). There has been much debate over the extent to which per se treatment of them is appropriate outside the traditional horizontal group boycott situation. *See, e.g.,* Bauer, *Per Se Illegality of Concerted Refusals to Deal: A Rule Ripe for Reexamination,* 79 Colum.L.Rev. 685 (1979).

Because Hoosier did not join with other tire manufacturers against M & H, the single tire rule clearly fell outside the classic horizontal group boycott paradigm. *See Fashion Originators' Guild of America v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (horizontal collaboration among clothing suppliers determined illegal per se); *Eastern States Retail Lumber Dealers' Association v. United States,* 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914) (horizontal collaboration among lumber retailers considered per se illegal). In both *Fashion* and *Eastern States,* competitors formed groups to protect themselves from competition from non-group members, and to limit competition among themselves, at the same level of competition. In *Fashion* clothing suppliers got together with other clothing suppliers and put pressure on retailers, and in *Eastern States* lumber retailers got together with lumber retailers and put pressure on wholesalers. Here, there is no suggestion of complicity between Hoosier and other tire manufacturers: Hoosier did not join with other tire manufacturers and put pressure on any group in order to limit competition among tire manufacturers or to protect a group of tire manufacturers from "non-group" tire makers.

M & H would find horizontal activity from the fact that the drivers agreed among themselves and the tracks agreed among themselves. But this would take us well beyond the *Fashion* or *Eastern States* paradigm. The drivers are not in economic competition with one another and while they are specifying the parameters within

which they will compete *on the race track*, what is missing is any effect upon *economic* competition among the drivers as was present in *Fashion* and *Eastern States*. While the tracks may be economic competitors in some sense, the rule does not limit economic competition among them either.[2]

■ To be sure, horizontal activity among competitors is not an invariable prerequisite to per se treatment of a boycott, *see* Sullivan, *Antitrust* at p. 223 n. 1. There are exceptions, *see, e.g., Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) which we discuss *infra*. As a general rule, however, courts subject horizontal boycotts to per se analysis and vertical arrangements to a rule of reason, and we are confronted here with a vertical arrangement only. The Second Circuit has explained the distinction as follows:

> It is important to distinguish between "horizontal" restraints, *i.e.,* agreements between competitors at the same level of market structure, and "vertical" restraints, *i.e.,* combinations of persons at different levels of the market structure such as manufacturers and distributors.... Horizontal restraints alone have been characterized as "naked restraints of trade with no purpose except stifling competition," ... and, therefore, *per se* violations of the Sherman Act. On the other hand, while vertical restrictions may reduce intrabrand competition by limiting the number of sellers of a particular product, competing for a given group of buyers, they also promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products.... They are, therefore, to be examined under the *rule of reason* standard.

*Oreck Corporation v. Whirlpool Corporation,* 579 F.2d 126, 131 (2d Cir.1978) (en banc), *cert. denied,* 439 U.S. 946, 99 S.Ct.

340, 58 L.Ed.2d 338 (1979) (citations omitted). The tire rule fits this characterization of a vertical restraint as a combination of persons at different levels of the market structure. M & H is complaining essentially that the drivers (the purchasers of tires) agreed with Hoosier (a seller of tires) and that the tracks enforced the arrangement. Such an agreement is best characterized as vertical.

The Second Circuit has stuck with the horizontal-vertical distinction, *see Borger v. Yamaha International Corporation,* 625 F.2d 390 (2d Cir.1980), and this distinction has been employed in other circuits. *See, e.g., Gough v. Rossmoor Corporation,* 585 F.2d 381 (9th Cir.1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). And, the Supreme Court has seemingly gone along with the distinction at least up to the point of a case such as *Klor's, infra. Compare Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (rule of reason applied to vertical territorial restriction placed on retailers by manufacturers) *and Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) (vertical exclusive dealing contracts analyzed under rule of reason) *with Fashion* (per se treatment given to horizontal arrangement) and *Eastern States* (same), *supra.* In *United States v. Topco Associates, Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972), the Court said:

> One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. Such concerted action is usually termed a "horizontal" restraint in contradistinction to combinations of persons at different levels of the market structure, *e.g.,* manu-

---

**2.** The fact, as here, that the combining group is not drawn from people who compete economically among themselves, is a further ground for rule of reason rather than per se analysis: such a combination is less likely to have been gener-

ated by an anti-competitive design—some other motive is at work which must be weighed against any incidental anti-competitive effects flowing from the combination.

facturers and distributors, which are termed vertical restraints.

■ We recognize that some courts have found that certain restraints which are vertical in form may be horizontal in nature or effect, *see, e.g., Cernuto, Incorporated v. United States Cabinet Corporation,* 595 F.2d 164, 167 & n. 15 (3d Cir.1979), and thus deserve per se treatment (*United States v. Topco* could be viewed as such a case). The restraint here is not, however, of that sort. We also recognize that the majority of cases which employ a rule of reason analysis when confronted with a vertical restraint involve a manufacturer-distributor relationship. But the very novelty of the present situation is one of the main arguments against a per se approach. The fact that this case does not fit this familiar pattern is not a reason to turn to per se analysis, but is rather a factor favoring the rule of reason.

### B. *The Klor's Case is Not Grounds for Per Se Analysis*

M & H argues that the single tire rule should receive per se treatment on the basis of *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), which involved a vertical arrangement. In that case, Broadway-Hale, a department store, conspired with the manufacturers and distributors of well-known brands, such as General Electric, RCA and Zenith, either to refuse to sell merchandise to its competitor, Klor's, or only to sell to Klor's at discriminatorily high prices and unfavorable terms. Although there was no horizontal agreement between Broadway-Hale and other retail merchants, the Court found the vertical agreement between Broadway-Hale and its suppliers sufficient, and ruled the boycott illegal per se.

The district court and M & H would cast Hoosier in the place of Broadway-Hale, and would cast the tracks and drivers in the place of Broadway-Hale's suppliers. Hoosier's position cannot, however, be equated

with Broadway-Hale's. The tracks and drivers invited tire companies to submit bids and to supply tires for testing. M & H, McCreary, Goodyear, and Hoosier (virtually all the extant suppliers of racing tires) responded. After competitive testing, the tracks and drivers selected Hoosier. Although the district court criticized various aspects of the tests, *see infra,* it also found that there was no collusion and it is clear the testing was not merely a sham, with Hoosier the predetermined winner. Hoosier did not instigate the rule nor did it conspire with the tracks and drivers to be selected. This is not a situation, comparable to that in *Klor's,* where Hoosier was found to have orchestrated the single tire rule in an effort to drive M & H out of business. Rather the object of the single tire rule was related to defendants' bona fide sports objectives. And M & H had a chance that year, and would presumably have chances in later years, to be selected as the winning tire for use under the rule. Unlike Broadway-Hale, Hoosier's conduct consisted of successfully competing for the right to supply tires for the 1982 season, and not of baldly seeking to drive a competitor out of business.

It is important, in this connection, to distinguish between a disappointed competitor and the object of an illegal boycott.[3] *See, e.g., Joseph E. Seagrams & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71 (9th Cir.1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *Instant Delivery Corp. v. City Stores Company,* 284 F.Supp. 941 (E.D.Pa.1968). In *Instant Delivery* the court observed,

> ... In each of those cases [*e.g., Klor's, Inc. v. Broadway-Hale Stores, Inc., supra*] the aim and purpose of the group boycott or refusal to deal was either to compel the object of the boycott to adopt a certain standard of trade practice, or to exclude him from competition.
>
> In the case at bar, the only "refusal to deal" with Instant was that inherent in the selection of some other carrier to

---

**3.** Although M & H was not selected for use under this single tire rule, M & H sold tires under single tire rules at several other tracks in the Northeast during the 1982 season.

perform the consolidated delivery service. The "exclusion" was a by-product of the decision to reinstate consolidated delivery which necessarily involves the use of one carrier.... I find nothing in this record to evidence an intent to discriminate against or to exclude Instant.... Instant is a disappointed competitor, not the object of an illegal boycott.

*Id.* at 947.

■ The single tire rule at issue here was not adopted to discipline M & H or to drive M & H out of business or indeed for any anti-competitive motive whatever. The "exclusion" of M & H from the four tracks was a by-product of a sports-oriented decision to have all drivers at those tracks race on a single compound, in order to insure greater equality between race participants as well as a less expensive sport. And the evidence indicates, as M & H properly conceded in argument, that specifying a single brand was the only feasible method to insure that a single rubber compound was being raced on.

### C. *Promulgation of the Single Tire Rule in a Sports Regulation Context Further Militates Against Per Se Treatment*

■ A further reason for denying per se treatment here is that the single tire rule was promulgated in a sports self-regulation context—an area in which courts have been reluctant to employ a per se analysis when confronted with boycott-like conduct, and instead consider the challenged arrangement under a rule of reason. *See, e.g., Brenner v. World Boxing Council,* 675 F.2d 445, 454–55 (2d Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982) (group boycott claim not subjected to per se analysis). The Supreme Court has stated that per se treatment is not appropriate where a "justification derived from the policy of another statute *or otherwise"* requires the use of a rule of reason. *Silver*

v. *New York Stock Exchange,* 373 U.S. 341, 348–49, 83 S.Ct. 1246, 1252–53, 10 L.Ed.2d 389 (1963) (emphasis added). Picking up on the Court's use of "or otherwise," many courts have reasoned that in the sports area various agreed-upon procedures may be essential to survival, *see, e.g., Hatley v. American Quarter Horse Association,* 552 F.2d 646, 652 (5th Cir.1977), and have not subjected concerted activity by sports-related organizations to the group boycott per se rule.[1] Most courts have limited per se treatment of group boycott-like activity in a sporting context to those situations in which a group of competitors at one level seek to protect themselves from competition by non-group members at the same level—the classic horizontal group boycott case, *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1177–79 (D.C.Cir. 1978), and deny per se treatment if the facts do not fit this paradigm, using a rule of reason analysis instead. *See Brenner,* 675 F.2d at 454 (collecting cases). Here, the facts do not fit this paradigm as Hoosier is not a member of a group whose members' objective is to insulate themselves from competition, nor is there any evidence that Hoosier participated in the tire testing with the purpose of excluding M & H from the market. Hoosier participated to win the bid, and M & H's exclusion was incidental.

Some courts have refused to employ a rule of reason analysis in a sports context unless first convinced that the sports regulation "passes" a three-part test articulated in *Denver Rockets v. All-Pro Management, Inc.,* 325 F.Supp. 1049, 1064–65 (C.D. Cal.1971). The district court adopted this approach here. It screened the single tire rule under *Denver Rockets* criteria, finding it deficient and hence unworthy of rule of reason analysis.

We need not determine whether, as a general matter, pre-screening under *Denver Rockets* criteria is desirable as a prerequisite to rule of reason analysis, or

---

**4.** The fact of concerted activity by the tracks and drivers does not, standing alone, require per se treatment. *See, e.g., Turf Paradise, Inc. v.*

*Arizona Downs,* 670 F.2d 813 (9th Cir.), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982).

whether, instead, use of that criteria should await introduction as a part of the rule of reason analysis. Even viewing the *Denver Rockets* factors as necessary prerequisites to rule of reason analysis, we believe the district court was mistaken in thinking the single tire rule "failed" the test.

The *Denver Rockets* test requires that there be 1) a legislative mandate "or otherwise" for self-regulation; 2) that the collective action be intended to (a) accomplish an end consistent with the policy justifying self-regulation, (b) is reasonably related to that goal, and (c) is no more extensive than necessary; and 3) that there are procedural safeguards which assure that the restraint is not arbitrary and which furnishes a basis for judicial review.

The district court stated that the single tire rule failed this test for several reasons. First, the court determined that the objective of the rule was to fix prices, and that price fixing cannot be a proper objective of sports regulation even if designed to achieve the admittedly legitimate goal of achieving competitive equality. Second, the court said that elimination of inter-brand competition is not a legitimate form of sports self-regulation. Third, the court found the single tire rule deficient because it was not adopted by an independent sanctioning organization interested in the sport as a whole. Lastly, the court found that the procedures followed by the tracks and drivers in choosing Hoosier lacked procedural fairness.

Turning first to the court's finding of price fixing, we agree that if the tracks and drivers were engaged in actual price fixing, this would be inconsistent with 2(a) and perhaps other aspects of the *Denver Rockets* test. (Indeed, price fixing would be a reason quite apart from *Denver Rockets* to strike down this rule.) We do not believe the challenged arrangement can properly be viewed, however, as an attempt to fix prices in the sense that that term is used in antitrust law. The district court's error, we believe, was to lump all modified class racing tires together into a single category. Prior to the 1982 season, the drivers were

purchasing the fastest tires they could afford, which meant that they were selecting high-cost, 15-inch tires that sold for around $140 apiece in 1981 (and would have cost as much as $170 in 1982). The single tire rule was designed to shift drivers from a 15-inch high-cost tire to a budget 13-inch tire which commonly sold for between $90–$100 apiece. M & H's own economic expert, Dr. Dalton, testified that the two types of tires were different:

> The impact of the group that you have referred to resulted in a lower price, as I mentioned, and a short term for a product that was different than that which was run generally in the open market.

M & H concedes in their brief that the products are different. *Brief for the Appellee* at p. 13.

The tracks and drivers were *not* attempting to fix the prices of high quality 15-inch tires, for which the free market had set prices close to $170, at the much lower price of $90–$100. Rather, the tracks and drivers simply asked the tire companies to supply them with budget 13-inch tires in the $90–$100 category. The tire companies then told the tracks and drivers what tires they were offering in that price range. The tracks and drivers were not demanding that the tire companies sell them any particular tire at a price below market—*i.e.*, they were not asking to be sold a $150 tire for $90. To the extent that any price break was offered, it merely reflected a permissible volume discount of a few dollars per tire, which the tire companies may have extended in the hope of increasing the chance at winning the bid. For these reasons we do not perceive the single tire rule as an attempt to artificially hold down the price of a particular product, a practice condemned by the Supreme Court in *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). All the rule attempted to do—like a rule specifying the use of certain low cost engine components—was to counteract the natural tendency of racers, if left unregulated, to buy the latest, state-of-the-art

equipment, which cost more to manufacture and hence more to sell.

Although the district court recognized the legitimacy of attempting to achieve competitive equivalency among racers, it said it was "not aware of any case that has approved the elimination of interbrand competition as a legitimate form of sports self-regulation." If interbrand competition had truly been eliminated, there might be cause for concern, but nothing so drastic occurred here. First, Hoosier was selected after non-collusive,[5] competitive—if unsophisticated, *see infra*—testing of various brands. Second, the court found that the rule was limited to the 1982 season, and there is no evidence to suggest that the tracks and drivers would not have conducted another competitive test to select a track tire for the 1983 season. A single racing season does not seem an unreasonably long period to tie up a relatively small portion of the racing tire market.

Finally, the district court was clearly erroneous in its finding that the four defendant tracks comprised 100 percent of the relevant market and that even after two tracks suspended the rule, M & H was still foreclosed from 50 percent of the market. We do not see how the relevant market can be said to comprise only the four tracks that adopted the rule. In the Northeast alone, there are at least 15 other tracks which feature modified short oval racing. While racing tires constitute a separate market from ordinary street tires used on passenger cars, racing tires are sold nationwide. The president of M & H testified that his company sold racing tires "[n]ationally, as well as overseas." Even if the relevant market were considered only short oval modified racing tires, as the president of M & H testified, M & H increased its sales of such tires from $52,000 in 1981, the year before the rule, to approximately $250,000 in 1982, the year that the rule was in effect.[6] Some of these M & H sales were made at other tracks at which M & H had been designated for use under a single tire rule. In light of this information contained in the record, it seems fanciful to suggest that the *relevant* market was limited only to the tracks that adopted the tire rule at issue here.

M & H has not shown, therefore, nor does the record reveal, any significant market foreclosure; nor was any foreclosure for an unreasonably long time. Thus, it is simply not accurate to say that the single tire rule "eliminated" interbrand competition.

With respect to the district court's view that sports regulations *must* be promulgated by an "independent sanctioning organization interested in the sport as a whole," the assumption seems extreme. We recognize that if a regulation is adopted by an independent sanctioning organization with no financial stake in the outcome, a court will have maximum assurance that the reg-

---

**5.** The district court expressly found "there was no evidence of collusion [*i.e.,* between Hoosier and the other defendants] in this case," although it felt the practices here "increase[d] the opportunities for collusion."

**6.** While the president of M & H estimated his company's sale of modified tires as $52,000 in 1981 and $250,000 in 1982, a more precise estimate is contained in M & H's answers to interrogatories introduced into evidence at the end of trial:

M & H sales records are not broken down by geographic area or category. However, by reviewing invoices, M & H has calculated that it had the following sales in the Northeast:

| | Total | Modified |
|---|---|---|
| 1980 | $207,051.88 | $ 36,119.01 |
| 1981 | 183,226.05 | 52,965.39 |
| 1982 to date | 635,796.21 | 346,981.84 |

According to this estimate, M & H increased its sales of modified tires by sevenfold while the tire rule was in effect. M & H's total tire sales for the above years were:

| | |
|---|---|
| 1980 | $1,816,109.08 |
| 1981 | 2,033,090.56 |
| 1982 | 2,066,766.90/August 31, 1982 |

There is no estimate for M & H's total modified sales worldwide. These figures demonstrate that the tire rule did not prevent M & H from selling modified racing tires, and the magnitude of the sales refutes any claim that the rule foreclosed any significant portion of the market to which M & H sold modified racing tires.

ulation is to protect fair competition within the sport. But it does not follow that the absence of such an organization absolutely precludes either a rule of reason analysis, or a successful result under that analysis. The absence of a sanctioning organization may well indicate a greater need to show that the regulation in fact promotes a significant sports aim, but that is a different matter.

In rejecting rule of reason analysis, the district court also cited an absence of "procedural fairness" in selecting the Hoosier tire. The court said that the notice given to tire manufacturers of the tests held in the fall of 1981 was inadequate. It found that manufacturers were not notified of key criteria used in judging the tires. It also found that the test procedures themselves were hit or miss, failed to account for relevant variables, and were not adequately recorded. Additionally NEDOC's surviving records were insufficient to satisfy the court as to why NEDOC thought Hoosier was superior.

We cannot agree with the district court that the record shows significant procedural unfairness; and insofar as the court felt that the tests were simply unsophisticated or unscientific we doubt the materiality of those weaknesses.

With respect to advance notice, it appears from the record that all companies were given essentially the same notice and, perhaps more importantly, all four interested companies participated in both tests. On January 24, 1981, NEDOC solicited proposals from all interested tire companies, including M & H, expressing interest in a tire rule, gave the McCreary Y–3 tire as an example of the kind of tire they were interested in, and asked for bids. On September 6 (or perhaps October 3, the record is unclear), the first round of tire testing was conducted and M & H, McCreary, Goodyear, and Hoosier participated, although M & H felt that it received overly short advance notice of the test. On October 1 the

NEDOC rules committee interviewed company representatives from M & H, McCreary, Goodyear, and Hoosier, concerning such things as cost and availability. On November 7 a second round of testing took place in which all the companies participated and as to which there is no complaint as to notice. The NEDOC records of the tests show that products from each company were tested, lap times recorded, and general impressions of the drivers doing the testing were noted. After tentative selection of Hoosier, representatives of NEDOC traveled to Hoosier's plant in Indiana to make sure that Hoosier's manufacturing facility could supply the number of tires needed. We think these processes were scarcely so deficient as to fall below the minimum standards of fairness called for in these circumstances.

We, of course, do not quarrel with the court's findings that the tests were, in effect, unsophisticated and poorly done, and the data poorly preserved. This would be highly material to any claim of collusion, bias or bad faith. However, the court found no evidence of collusion, and there is no claim of bias or bad faith. As the products from each tire company were considered without favoritism or bias, we do not think it critical whether the testing was truly scientific or resulted in selection of the objectively "best" tire.

█ We recognize that one of the evils of group boycott activity is that a private group may arrogate to itself quasi-judicial powers, a normally public function. *Fashion Originators' Guild of America v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). In those situations where private groups are permitted to exercise such public powers, they may be required to afford fair and appropriate procedures. In *Silver v. New York Stock Exchange*, for example, the Court permitted the stock exchange to discipline and expel users of the exchange facilities, but required the exchange to proceed in a fair manner with

These figures strongly suggest that limiting the relevant market to the four tracks that adopted the rule at issue here was clearly wrong.

basic procedural safeguard. Similarly, when sports leagues have been allowed to exercise quasi-judicial powers with respect to disciplining of players or revoking of eligibility status for tournaments, more elaborate procedures have been employed than were afforded the tire companies here. *See, e.g., Brenner v. World Boxing Council,* 675 F.2d 445 (2d Cir.1982); *Deesen v. Professional Golfers' Association of America,* 358 F.2d 165 (9th Cir.), *cert. denied,* 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966).

However, the decision making involved in selecting a tire scarcely calls for elaborate quasi-judicial procedures like those suitable in cases of penalties, discipline, or suspension. The decision called for here is essentially one of business judgment. The question is not what is the "best" tire in some objective sense, but what is the tire the racers actually prefer. To the extent that procedures are required, they are simply those that are reasonable to help assure that the selection is made non-collusively and with equal consideration among the tires of different producers. We discern no duty to provide an absolutely objective or scientific basis for decision. In the present case, the evidence is clear that defendants solicited and received tires from all interested companies for testing, and that, in good faith they conducted a form of testing. As a result, they selected a tire which in good faith they felt was best for their particular purposes. We believe that these procedures were sufficient, whatever their shortcomings in terms of scientific or objective analysis, to meet the *Denver Rockets* standard in these circumstances.

 We conclude that the district court erred in holding that the *Denver Rockets* test, if it applies, stands as a barrier to rule of reason analysis here.

## III. RULE OF REASON

Having held that per se analysis is unwarranted, we turn to the district court's

alternative holding that the single tire rule fails rule of reason scrutiny. While the question is close, we believe that the court erred in finding a Sherman Act violation under rule of reason analysis. First, we explain why we believe the single tire rule passes rule of reason examination, and later we address some of the specific concerns expressed by the district court.

### A. *The Single Tire Rule Passes Rule of Reason Scrutiny*

If the tracks and drivers' only goal had been to control the increasing cost of racing so that the number of participants would not dwindle, we assume there would have been no legal objection to some procedure like the following: The tracks and drivers could have asked tire manufacturers to supply them with the model numbers of budget tires which the manufacturers would be willing to sell for between, say, $90–$105 each. The tracks and drivers could then have conditioned the rights of the dealers to sell these tires at trackside on the promise of the dealers and manufacturers to sell the tires at the specified price throughout the racing season and to sell to all drivers who wished to purchase. Such a scheme would have reduced the cost of auto racing and yet allowed competition among manufacturers. Here, of course, the competition would be to see which company could make the best "budget" tire rather than who could make the best tire regardless of price; but we detect no infirmity in such a scheme.

The justification for the single *brand* tire rule must come, if at all, from the desire of the tracks and drivers to promote competition and parity among participants by requiring that all drivers race on a single rubber compound. M & H has conceded that the only practicable method of insuring that drivers are racing on the same rubber compound is to specify a single tire brand.[7] Even then, there may be some

---

**7.** At argument counsel for M & H said:
 If you decide that all drivers have to race on identical tires, and identical in every respect,

you probably need something like a single tire rule. And the reason is that although it's perfectly possible to have very detailed speci-

variations between the production run of the same tire model. There are various technical reasons why different manufacturers could not be asked to make a tire to a given standard specification, which we see no point in exploring here. We take the parties' word that it cannot be done given present tire technology.

We turn next to what is our general premise, that the tracks and drivers have the power to set the parameters within which the racing competition will take place.[8] Thus they can establish such things as the permissible range of gear ratios, allowable engine sizes, allow or prohibit aluminum block engines, and so on. *See generally Gunter Harz Sports, Inc. v. United States Tennis Association*, 511 F.Supp. 1103 (D.Neb.), *aff'd*, 665 F.2d 222 (8th Cir.1981) (prohibition against double-string tennis racquets upheld); *STP Corp. v. United States Auto Club, Inc.*, 286 F.Supp. 146 (S.D.Ind.1968) (turbine engine specifications upheld). In auto racing, such standardization of equipment would tend to increase the importance of driving skills over equipment, and would surely be a legitimate goal. In the above examples, however, the drivers can, at least in theory, continue to select from a variety of manufacturers so long as the specifications are met. What makes the single tire rule controversial is the specification of a single manufacturer's tire in order to achieve the goal that a single rubber compound is used. The question narrows to whether the tracks and drivers can set the rubber compound parameters, as they have set other limitations, when setting this particular parameter has the effect of imposing some limits upon competition among tire makers. A collateral question is whether an available alternative scheme exists which would achieve the same goal of promoting participant parity while having a lesser effect on the market.

We are aware of no cases dealing with sports regulation that suggest an appropriate mode of analysis to answer the specific question whether a parameter can be set in a sports context which has an effect on market competition. We think, however, that cases dealing with requirements contracts are instructive, particularly where, as here, the tracks and drivers have essentially agreed to fill all their tire requirements for the 1982 season by purchasing budget tires from Hoosier. Courts judge the lawfulness of requirements contracts under the rule of reason, *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 333, 81 S.Ct. 623, 631, 5 L.Ed.2d 580 (1961), and this is true even if the contract contains a promise to buy *exclusively* from the seller or obtain all requirements from a supplier for a specified length of time. *See Barry Wright Corporation v. ITT Grinnell Corporation*, 724 F.2d 227, 236 (1st Cir.1983) (collecting cases). In *Barry Wright* we described the proper method of determining the probable effect of a requirements contract on competition in the relevant market:

> [W]e are to take into account both the extent of the foreclosure and the buyer's and seller's business ·justifications for the arrangement. We must look both to the severity of the foreclosure (a fact which, other things being equal, suggest anticompetitive harm) and the strength

---

fications for the construction of the tire, or the width, or the height, or the tire stagger, or the number of times you change a tire, or whether you're permitted to use special left side and right side tires, those things, which are problems in this area, can all be addressed by simple straightforward rules. But if you decide in advance that every driver has to race on exactly the same tire, you probably need a tire rule because as my client conceded and as most people familiar with this concede, the one step in tire manufacturing, the compounding—the adding of the rubber compound to the carcass—is a sort of a black art.

And there isn't any quickly available tool to compare compound one with compound two as they come to the track.... Specifying one manufacturer is probably the only way that you can ensure that everybody races on the identical compound.

8. By the same token, if football teams and owners "combine" to change the rules of the game to eliminate expensive equipment and generally to simplify the sport, we cannot conceive an antitrust violation simply because of the economic impact on suppliers.

of the justification in determining whether the "size" of the contract to purchase is reasonable.

*Id.* at 236–37 (citation omitted).

We begin the analysis outlined in *Barry Wright* with the observation that a single-supplier contract for a single racing season does not seem unreasonably long. Further, despite the district court's view that the rule foreclosed at first 100 percent and later 50 percent of the relevant market, the record suggests nothing approaching this sort of foreclosure. Section II, *supra.* Modified racing is carried on around the country at many other tracks. M & H sales of modified racing tires increased, at the very least, from approximately $52,000 in 1981 to $250,000 in 1982, *see supra* note 6 and accompanying text, suggesting that M & H was not prevented from selling its tires in the available market, to any great extent, by the rule.

Certainly, the rule did not prevent M & H from selling tires and getting driver feedback during 1982; thus, it would seem that M & H would be as capable of competing in 1983 for designation under the rule at issue here as it was in 1982. This is not a situation in which Hoosier had a monopoly on being designated as the required tire for use under a rule at all tracks conducting modified racing. The president of M & H testified that in 1982 M & H sold tires under a single tire rule at the Waterford racetrack in Connecticut, and at the Islip and Riverside racetracks in New York. In previous years M & H had sold tires under similar rules at Danbury and Islip. Thus, the single tire rule here did not result in M & H having to sit on the sidelines of the racing tire market for a whole season, without sales, in the hope of winning designation under a tire rule in 1983, as M & H suggests in its brief. There is nothing to indicate that in 1983 Hoosier could not have competed to be designated as the tire for use under a rule at the tracks where M & H was so designated in 1982, and vice versa. On a requirements contract form of analysis, we have great difficulty in perceiving any violation. This is particularly so where both the district court and the parties seem to agree that advancing participant parity is a reasonable goal.

■ Promotion of parity provides a sound business justification for the rule. In addition, the drivers can, it would seem, legitimately seek to obtain a stable, favorable price. *See Barry Wright*, 724 F.2d at 237. Further, as the drivers would presumably be purchasing in large quantity, Hoosier could afford to give a discount to reflect these increased sales (Hoosier in fact offered a price break of five dollars per tire and apparently was willing to go lower if asked); the increased certainty would perhaps also allow Hoosier to engage in production planning that could lower its costs. The combination of legitimate business justifications and the limited market foreclosure saves the rule.

It can be argued that the parity goal could have been achieved by less restrictive means, such as requiring use of a single brand for some time less than a whole season—by specifying a single tire brand on a per month, per week, or even per race basis; or that if for a whole season, at least it should have been done on a per track basis, with each track using a different brand, rather than by a group of four tracks.

It might, however, seem impractical to require that single tire rules operate for less than a single racing season, particularly given the goals that the tracks and drivers sought to achieve here. It is obvious that the tracks and drivers were concerned not only that all competitors race on the "same" compound, but that the compound chosen offer a good combination of handling characteristics, speed, and so forth. If they had not been concerned about such matters, testing could have been replaced by a coin flip, or a tire could have been chosen on the basis of low price alone. While judgments concerning which tire offered the best combination may be somewhat subjective, and M & H complains that the criteria for testing was never made very explicit, these are judgments which

the tracks and drivers were entitled to make.

It would also seem unrealistic to test for these characteristics on a weekly or monthly basis, and impossible to do so between races. This is particularly so here because the drivers had limited funds with which to conduct the tests. And, there would seem little utility in retesting the same models of tires. It would only make sense to retest tires after design or compound changes had been introduced by a manufacturer. It does not seem unreasonable to test for the effects of such changes at the start of each racing season.

To some extent, structuring the rule on a per race, per week, or per month basis would also have undermined the cost savings goal. In part, the tracks and drivers selected a tire that they felt would be "repeatable," that is, usable in more than one race. To the extent that a driver had used a particular brand tire in a race and those tires were in suitable shape for another race, there would be, at least, the added initial expense to purchase another brand tire for the next race, be it a race held later the same day, or the following week, or whenever. Further, the drivers would have additional tires to transport and store until the next race at which they could be used. And, at the end of a racing season a driver might be stuck with four sets of used tires instead of one. Developments in the off-season might make such tires obsolete or otherwise not suitable for use at the tracks at which the drivers raced, and hence useless a year later.

These same types of problems would confront a driver who raced at the four tracks involved here, if those tracks each adopted a single tire rule for the whole season, but each specified a different model. Indeed, the very reason the drivers adopted the rule in concert with the four tracks is that these four tracks were the ones at which they most often raced. Many drivers would race at one track on a Friday evening, and another the following Saturday afternoon. Thus, the concerted action by tracks at which a common pool of drivers raced contributed to the cost savings goal sought by specifying an inexpensive tire. Further, there is a certain administrative convenience in conducting joint testing of tires; and, as mentioned above, there were limited funds for tire testing which were nearly expended by conducting joint tests. Thus, the possible less restrictive alternatives are more hypothetical than practical.

At least, in the absence of any demonstrated significant market foreclosure, we find no infirmity with the common sense approach to implementation of the single tire rule adopted by these tracks and drivers.

B. *Responses to Specific Concerns Raised by the District Court*

The district court determined that the single tire rule failed a rule of reason analysis because "the Sherman Act reflects a legislative judgment that competition will produce not only lower prices, but also better goods and services," 560 F.Supp. at 606, and that the single tire rule lessened the incentive and opportunity to innovate as well as raising entry barriers and creating opportunity for collusion.

We perceive no reduction in the opportunity or incentive to innovate. First, Hoosier had an incentive to innovate because it presumably desired to be selected for use under the tire rule at issue here in 1983, and would also like to be selected as the track tire at tracks with tire rules that were currently using other brands. And, Hoosier would continue to innovate and develop tires for use at tracks that did not have tire rules. There was evidence that, as the 1982 season wore on, it became apparent that Hoosier tires had a tendency to come off wheel rims. If the rule had been allowed to continue, it would not be surprising if Hoosier had improved their tires before being considered as the tire for 1983, and there was evidence that Hoosier had begun to work on the problem in 1982.

Likewise, M & H was not deprived of any opportunity to innovate. Its tires (at least $250,000 worth) were being driven on other tracks, and M & H was able to receive any

actual racing performance feedback that might be necessary to further innovations from the tracks at which it was designated and from the tracks that did not have single tire rules. Also these sales provided needed revenues during the 1982 season so that M & H could afford to innovate, test, and so forth. The tire rule did not force M & H to wait out a whole season before it could sell any tires.

As we stated earlier, the Hoosier tire rule passes a requirements contract form of analysis and thus we discern no appreciable market foreclosure or entry barrier problem. The expert testimony upon which the district court relied to find entry barriers appears premised on the incorrect assumption, see Section II, supra, that Hoosier had locked up between 50 percent and 100 percent of the relevant market, and M & H makes much of the fact in its brief that a tire producer may lose the annual selection process "and be foreclosed from selling his tires for an entire season." The simple answer to this is that no such market foreclosure occurred; M & H increased its sales of modified tires at least fivefold during 1982.

While the district court felt the rule might, in general, create an opportunity for collusion, it found that there was no evidence of collusion in this case. 560 F.Supp. at 606. And, the testimony of M & H's expert supports the finding of a lack of collusion in the tire market. We are reluctant to overturn a particular business arrangement while employing a rule of reason analysis on the basis of a "tendency" to promote collusion, when there is a well-supported finding of the absence of collusion.

The district court also stated that "the evidence at trial did not demonstrate that the Hoosier tire rule was essential to the survival of professional auto racing as a sport, or that, over time, such a rule would effectively cut costs at all." 560 F.Supp. at 607. First, we do not think the rule need be "essential" to the survival of the sport in order to carry justification. There is uncontroverted evidence that a number of unrelated tracks in the Northeast have adopted a single tire rule. This adds credibility to defendants' belief that such a rule was a proper solution to certain real problems in the sport.[9] A tendency towards over-sophistication of equipment coupled with escalating costs, which could drive out participants, is a problem people involved in a sport are entitled to address, and is sufficient, we think, to justify an attempted solution of this type. In other forms of racing, standardizing of equipment is commonplace—for example, in "one-design" sailboat racing, identical boats, perhaps produced by a single supplier, are rigorously specified. Such an approach prevents the endless cost spiral invited when each competitor is allowed to design his own boat and provide equipment of his own choice. Second, the finding that there was

---

**9.** The record contains testimony which shows that Hoosier did not have a monopoly on being designated for use under tire rules. The president of M & H testified that his company had been used as a track tire at several race tracks in 1979, 1981 and 1982. The following testimony from the promoter at Seekonk shows that even at a single track different companies supplied tires for use under tire rules in different classes of racing.

A The modified class was on the Hoosier budget slick, the 13-inch and the Prostocks were on a Hoosier 11-inch economy slick. The street class had been on the same tire for five to six years. It is a recap tire supplied by Commercial Tire Company. The ministock competitors chose to use a used Goodyear. "Scrub tire" is what they call it. That is a slightly used tire that was imported, used on

formula racing, and it has been available through them at a much-reduced cost. So I agreed to let them stay on that tire that was available to them.

Q Now, sir, directing your attention to the Pro-stock class, when did you first institute a one-brand, one-tire rule in that class?

A 1978.

Q What brand of tire was the designated tire in that division in 1979, 1980 and 1981?

A McCreary 9-inch slick.

The record reveals that discussion of and experimentation with tire rules was a widespread phenomenon. Not only were racers in classes other than modified using tire rules, but such rules were considered as early as 1972 by various groups as one way to control costs and increase parity.

no evidence that the tire rule would effectively cut costs at all seems clearly incorrect. The inference is compelling that requiring all drivers to use low cost tires will save them money.

The district court was concerned that a tire rule is not a reasonable approach to controlling the cost crisis in auto racing. "Alternative approaches to the cost crisis could include increased purses, objective specifications restricting engine performance, or some more reasonable approach to tire specifications." 560 F.Supp. at 607. If cost cutting were the only goal of the tire rule, a less restrictive approach might have been devised to control tire costs. We have already described one such theoretically possible approach, *supra.* However, there appears to be no "more reasonable approach to tire specifications" if the goal is to have all drivers racing on a single tire compound.

To the district court's suggestion that costs be controlled by limiting engine performance, the answer seems to be that a number of such steps have been taken. Aluminum block engines have been prohibited, a gear rule was adopted, fuel injection was banned, and carburetor size was specified. The fact that the tire rule was not the sole element of cost control introduced, and that it was felt that such a rule was still needed in light of these other measures, indicates that the rule was adopted for bona fide reasons and that the cost savings motive was not merely a smoke screen to cover up improper designs by Hoosier. (We have already noted, additionally, the adoption of tire rules at some other, unrelated tracks.)

We cannot be confident that increased purses would solve the cost problem either. There was testimony to the effect that the tire rule would not greatly affect the order of finish among drivers, but that it would make the races "tighter" and "cheaper." One of the prime concerns in adopting a tire rule was to keep the field of participants from dwindling. If increasing costs were "controlled" only by offsetting them with increased purses, then a number of racers might still be forced to leave the sport for lack of sufficient winnings. Little or no "savings" would be passed on to them. This is so even though the whole field "shares" the purse because the majority of winnings still goes to the top finishers. The goal of preserving the spectacle of a large field of participants and promoting tighter races could not clearly be achieved by simply increasing the purses. And, the record does not show that the sport could bear increased purses, which presumably would have to be financed by either higher priced tickets or increased ticket sales.

We are satisfied that the conduct defendants engaged in was justified as a reasonable way to regulate and improve modified class auto racing, and that it did not in all the circumstances have anti-competitive ramifications so severe as to warrant a finding that it was illegal.

*For the foregoing reasons the judgment of the district court is reversed.*